JOHN W. McCLAIN, ADMINISTRATOR OF THE ESTATE OF CHARLES MC-
CLAIN, DECEASED, RESPONDENT, v. KANSAS CITY BRIDGE COM-
PANY, A CORPORATION, APPELLANT.—116 S. W. (2d) 253.

Kansas City Court of Appeals. March 7, 1938.

*Russell Field* and *Mosman, Rogers, Bell & Buzard* for respondent.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau, Richard S. Right-
er* and *Dean E. Wood* for appellant.

CAMPBELL, C.—Action for damages for the death of Charles Mc-
Clain due to the alleged negligence of the defendant. The plaintiff
obtained a judgment for $5280, from which the defendant has ap-
pealed.

The deceased, Charles McClain, was, at the time of his death, about
8:30 P. M., February 28, 1932, an employee of the defendant, and
he and other members of a crew on board defendant's floating barge
were engaged in driving piling into the bed of the Missouri River.

The petition alleged in part as follows:

"Plaintiff states that on said day and at said place, the said Charles McClain was in the employ of the defendant and engaged in said maritime enterprise on said river and working on the said boat or vessel and a member of the crew thereof; his duties being that of a leadsman, and he was required to work in the rigging of the pile driving apparatus on said boat, and his duties, among others, being to stand in said rigging at a place about thirty feet above the deck of said vessel and place the 'bell caps' upon the piling before the said piling was driven, and in working in said rigging, it was necessary and he was required to climb up and down and work upon a ladder along which the defendant ran and operated a jet line which, in the course of the operation thereof, whipped to and fro and toward and away from the ladder upon which the said deceased was required to work and in such close proximity thereto as to be likely to strike deceased if the said jet line was in operation at any time when the deceased was required to be on said ladder.

"Plaintiff states that on said date and at about the quitting time thereof, the said Charles McClain was attempting to climb down said ladder as was his duty to do, at which time the operation of the jet line had ceased, and while he was on said ladder, the defendant negligently and carelessly and without warning to the said deceased, operated the said jet line which caused it to whip out from the ladder and strike deceased, throwing him violently from the said ladder and causing him to fall upon and strike the deck of the said vessel and to be hurled therefrom into the waters of said Missouri River, by reason of which said acts, he was killed and lost his life."

The answer was a general denial and a plea of assumption of risk. The single question presented on this appeal is whether or not the court erred in refusing defendant's requested instruction in the nature of a demurrer to the evidence.

The barge was about seventy feet long and twenty-two feet wide, and on its front end there was a tower (spoken of in the evidence as the "leads"); there was a ladder, a part of the tower which was used by the leadsman in ascending and in descending the tower.

Plaintiff's witness, Johnston, testified:

"The leads men at that time had to pull this pile over and up into the leads, and then it is picked up by machinery, then the hoisting engineer picks it up and gets it around in front of the leads, and the leads man uses a belly rope to throw it around this pile and pull it up into the leads, and then after he gets it up into the leads, and the engineer or foreman says, 'Set it, set it on the river,' and then he just puts a bonnet on it and after he gets that bonnet into place, he has to holler for the hammer. After that, then he uses the jet to make it easier to drive.

"Q. I don't think you have described the jet. If you did, I didn't

hear you. What is this jet? A. Well, a jet is a steel pipe, I judge, about fifty, fifty-one or two feet long, and it is handled with a five-eights inch steel cable that runs to a drum, the front drum of the hoist. . . .

"Q. Where does the cable go, from that point? A. It goes over the top of the leads, over a shive block, and back down around the drum of the hoists. . . .

"Q. And the shive up here at the top is about how far from the deck? A. Fifty-one feet, I think it is, from that deck, something like that.

"Q. Then, as the cable, the jet cable comes down to the deck, what does it fasten on to there? A. The steel drum of the hoist.

"Q. How is that drum operated? A. By the engineer, with a friction lever.

"Q. Is it automatic? A. No, no, sir.

"Q. Tell us about it. A. If the engineer wishes to raise or lower the jet, he has a friction lever. He can pull it up, throw the lever in and raise the jet, and if he wants to slack it down, he releases the lever and lets the jet down.

"Q. So that it is operated solely at the will of the engineer. A. Yes, sir. . . .

Continuing—

"The cable is dead-ended on to a drum, some three feet long, I would judge that long, and I guess two feet or better around, and the cable runs back and forth across this drum, as the jet is picked up. Sometimes when the jet is down, and it hits some substance, this cable would be either on the left-hand side of the drum or the right-hand side of the drum, and if the jet line was on the left-hand side of the leads, or ladder, and the end of the cable would be on the right-hand side, and it would make it tight, it would be bound to whip back across the leads.

"Q. And that did whip back and fourth? A. Yes, sir, it did.

"Q. Sideways, as well as in and out? A. Yes, sir.

"Q. And have you seen it do that? A. Yes, sir, I have. . . .

"Q. And is it on the pull, when it whips? A. Well, when they make it tight, and the slack that is in it, and they make it tight with the drum, it has a tendency then to whip back and forth. . . .

"Q. Where does the engineer sit on the barge, with reference to the shed over the machinery? A. Well, the front end of the cab is open, and the engineer of course on the engineer's set-up, about even with the hoist there is a cab on the outside, but all of the front is open, where he can see it, in plain view.

"Q. Is he there in plain view of the entire rigging and the work there? A. Yes, sir.

"Q. All right. Is the pump in charge of the engineer? A. Yes, sir.

"Q. Having been a foreman on the job, do you know what the duties of the foreman are? A. Yes, sir, I do.

"Q. Now, what are the duties of the foreman—first, do you know what the duties of the engineer are? A. Yes, sir.

"Q. Now, what are the duties of the engineer, with respect to keeping a lookout of the work that is going on. A. It is the engineer's—it is the engineer's duty to see that the leads man is always in the clear. He has a plain view of the leads man at all times; if he looks up at all, he can see the leads man. . . .

"Q. Let's get down to the duties of the leads man. What does he do? A. When the engineer picks up piling out of the water—picks them up with the drum on this same hoist—picks it up and swings it around in front of the barge, or leads, and the leads man as a general rule has a three-quarter inch rope about ten or twelve feet long that is called the belly line. It is his duty to throw this line around the pile, to catch the other end of the line and pull it back in the lead and get it into position for the foreman to set up; then, it is the duty of the foreman to holler and ask the leads man, as a general rule, 'What do you say up there?' It is his duty then to say, 'Set the pile.' After they set it, he has to put the bonnet on that same pile, and then he calls for the hammer.

"Q. What is this bonnet? A. A steel, like a saucer, made in the shape of a saucer; I judge it would weigh about fifty pounds on this particular saucer, or bonnet. . . .

"Q. Having been foreman on that particular pile driver, do you know what the duty of the engineer is, with respect to operating the jet when the leads man gets on the ladder to come down? A. It is his duty to stop the jet, not use it while the man is on the ladder.

"Q. Why is that? A. Well, it is for safety. It is the engineer's duty to always watch for the leads man, and keep him in the clear as best he can.

"Q. I don't know whether I have asked you, and I may have asked this—is that jet line under the sole control of the engineer? A. Yes, sir.

"Q. So he can operate it when he wants to, and stop it when he wants to? A. Yes, sir.

"Q. Now, how far have you seen that jet line whip out? A. Well, some eight or ten feet.

"Q. And when the jet is resting on some solid substance, where is the jet line then, with respect to the ladder? A. Laying against the ladder.

"Q. Is there slack? A. There is bound to be slack, if it hits anything solid in the river bed.

"Q. Well, it is lying against the ladder? A. Yes.

"Q. Now, Mr. Johnston, was there any device of any kind or char-

acter on this ladder and pile driver lead, to prevent that jet line from whipping out? A. There was not. . . .''

The witness, Johnston, was not present at the time of the fatal accident.

C. D. Hart, for the plaintiff, testified that he saw McClain on the third landing in the leads about thirty feet above the deck of the barge; that McClain was walking from the landing to the ladder, was "stepping around the ladder."

"Q. You say he was stepping around on to the ladder, the last you saw of him? A. Yes.

"Q. What was the next thing that happened? A. Well, I heard a noise in the river and looked, and there was a man in the river.

"Q. Did you hear the noise, as he hit the deck? A. Yes, I heard him hit the deck. . . .

"Q. Now, Mr. Hart, I want you to tell these gentlemen whether or not that jet line had been stopped and the jet dogged off? A. No, sir.

"Q. At the time you last saw Charlie McClain? A. No, sir, it had not. It was running.

"Q. Was the jet line in operation at the time you heard the noise hitting the deck and in the water? A. Yes, sir.

"Q. How long a time was it, if you can estimate the time, from the time you saw him stepping around on to that ladder, until you heard the thud on the deck? A. I saw him on the ladder and I just turned around and started to coiling some line, and heard the next

"Q. Well, was it a second or less? A. Well, something like that; less than a minute.

"Q. Now, tell the jury whether or not, as the engineer sat there at his machinery, was he where he could plainly see this rigging and ladder? A. Yes, he was where he could see it."

Arthur Hart, for the plaintiff, testified that he had seen the cable whip and sway from one side of the ladder to the other and hit the top of the cab; that the leadsman had no way of ascertaining when the engineer would operate the jet line.

Virgil Kellison, for the plaintiff, testified that at the time in question he saw deceased on the third landing of the tower, and that in a few minutes thereafter he saw the body of deceased falling head down toward the deck; that at that instant of time the jet line was working.

The evidence further shows that McClain in falling struck a fellow workman, and both were caused thereby to be thrown into the river. The workman was rescued but the body of McClain was not recovered until several months thereafter.

Under the allegations of the petition it was incumbent on the plaintiff to produce substantial evidence tending to prove that at the time McClain "stepped" from the landing onto the ladder the jet

line was not operating; that thereafter the jet line was put in operation, which operation caused it to whip and strike McClain.

Plaintiff failed to offer any evidence tending to show that the jet line was not operating at the time McClain went from the landing onto the ladder, or evidence showing that the jet line was put into operation while McClain was on the ladder, or evidence showing that the jet line was whipping between the time McClain was on the landing and the time his body struck the deck. On the contrary plaintiff's evidence was to the effect that the jet line was operating during all of said time. Thus, plaintiff disproved the essential allegations that when deceased went upon the ladder the *"operation of the jet line had ceased, and while he was on said ladder, the defendant negligently and carelessly and without warning to the said deceased, operated the said jet line which caused it to whip out from the ladder and strike deceased. . . ."* (Italics ours.)

There was no evidence tending to show that slack in the cable was taken up or that the cable whipped at any time after the deceased started from the landing.

The plaintiff, however, argues that one of defendant's witnesses testified that at the time deceased fell the "engineer was picking up the jet." The witness referred to said, "They was picking up the jet." There is nothing in the testimony of that witness indicating that he referred to the time when the deceased was on the ladder.

The plaintiff further contends it was the duty of the engineer not to operate the jet line while the leadsman was on the ladder. The evidence for the plaintiff shows that when deceased stepped upon the ladder the jet line was operating. From that time until the deceased fell, the time was so short that the engineer had no opportunity to observe the situation and act upon it.

It is plain the pleaded case was not supported by any evidence, and therefore the request for directed verdict should have been given.

There is another reason sufficient in itself supporting the defendant's contention that plaintiff failed to make a case for the jury.

The parties agree the action is under 46 U. S. C. A., section 688, commonly called The Jones Act. Under that act assumption of risk is a defense. [Scheffler v. Moran Towing & Transportation Co., Inc., et al., 68 F. (2d) 11.]

It appears from plaintiff's evidence that any one on the ladder while the jet line was operating was in danger. When McClain stepped from the landing to the ladder while the jet line was in operation, he moved from a place of safety to a place of danger. The danger was obvious and he, therefore, as a matter of law, assumed whatever risk attended his act. [Williams v. Terminal R. Ass'n of St. Louis, 98 S. W. (2d) 651; Scheffler case, *supra.*]

The plaintiff argues that the fact the deceased struck the deck

six or eight feet from the bottom of the leads, tends to show the cable knocked him from the ladder.

We do not find the place where McClain struck the deck furnished any substantial evidence that the cable struck McClain and caused him to fall from the ladder.

Applying the rule concerning the value of circumstantial evidence announced in the case of State ex rel. v. Cox et al., 298 Mo. 427, 250 S. W. 551, to the facts in the instant case, it is clear the plaintiff failed to show the defendant was negligent.

The defendant failed to call its engineer or account for his absence. The presumption arising from such failure does not prove or tend to prove the facts alleged in the petition. It must be borne in mind that the case is one in which plaintiff's evidence shows affirmatively that he was not entitled to have a verdict.

For the reasons stated, the judgment is reversed. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The judgment is reversed. All concur.