MOLLY KNORP v. GUY A. THOMPSON, Trustee of the MISSOURI PACIFIC RAILROAD COMPANY, Appellant.—No. 38491.—175 S. W. (2d) 889.

Division One, December 6, 1943.

*Thomas J. Cole, James A. Potter, W. W. Blain* and *Leon P. Embry* for appellant.

46

*Trusty & Pugh, Price Wickersham* and *Fred F. Wesner* for respondent.

48

VAN OSDOL, C.—This case has been certified and transferred to this court by the Kansas City Court of Appeals under the provisions of Section 6, Amendment of 1884, Article VI, Constitution of Missouri. The action is for the wrongful death of plaintiff's·husband who was killed on March 17, 1939, when a Ford Model A truck, in which he was riding, and defendant's passenger train No. 16 collided at Elkhorn crossing about one-half mile west of California, Missouri. Defendant appeals from a judgment in the sum of $4500, assigning errors of the trial court in refusing a request at the close of all of the evidence for an instruction directing a verdict for defendant; in the admission of evidence; and in the giving and refusal of other instructions.

Appellant (defendant) has filed a motion to retransfer the case to the Kansas City Court of Appeals, asserting that the cause was erroneously certified to this court and that, therefore, this court has no jurisdiction of the case. We should rule the motion to retransfer before we approach a consideration of the assignments of error.

The Kansas City Court of Appeals reversed the judgment for plaintiff, being of the opinion that plaintiff failed to make out a case for the consideration of the jury. Knorp v. Thompson (Mo. App.), 167 S. W. 2d 105 at page 115. Judge CAVE of the Kansas City Court of Appeals, although concurring in the (judgment of reversal) result, could not ". . . concur in that portion of the opinion which

holds that we may . . . look to the evidence in another record for testimony which was introduced in another case (Hutchison v. Thompson, Trustee, Mo. App., 167 S. W. 2d 96), and take such testimony into consideration in the present case in deciding the issue of whether the plaintiff in the present case made a submissible issue for the jury at the time her case was actually tried. . . ." 167 S. W. 2d at page 115.

Section 6 of the Amendment of 1884, Article VI, of the Constitution of Missouri provides that,

"When any one of said courts of appeals shall in any cause or proceeding render a decision which any one of the judges therein sitting shall deem contrary to any previous decision of any one of said courts of appeals, or of the Supreme Court, the said Court of Appeals must, of its own motion, pending the same term and not afterward, certify and transfer said cause or proceeding and the original transcript therein to the Supreme Court, and thereupon the Supreme Court must rehear and determine said cause or proceeding, as in case of jurisdiction obtained by ordinary appellate process; and the last previous rulings of the Supreme Court on any question of law or equity shall, in all cases,· be controlling authority in said courts of appeals."

■ Appellant, in supporting the motion to retransfer, urges that a case decided by ■ a court of appeals is properly certified and transferred to this court upon the ground of conflict with a previous decision of this court when, and only when, a judge of the court of appeals deems the result, or some ruling which is controlling of the result, to be in conflict with a previous decision of this court. And appellant insists that, since the result (judgment of reversal) reached by the Kansas City Court of Appeals was concurred in unanimously by the judges, it is obvious that the "portion of the opinion" which Judge CAVE deemed to be in conflict with previous decisions of this court was not a ruling which was controlling of the result reached, and so is not a "decision" of a court of appeals within the meaning of the Section of the Amendment.

This court has stated the meaning of the word "decision," as used in the Section of the Amendment, supra, in connection with a discussion of the purpose of the Section, in the case of Keller v. Summers, 262 Mo. 324, 171 S. W. 336, "The Constitution was not concerned with the sums of money awarded to the plaintiff or other decretal orders of the courts further than these were the consequence of the *principles of law and equity announced* in the opinion or decision and *upon which they were based.* What the Constitution designed to prevent was repugnancy of rulings between courts of appeals or between them and the Supreme Court, and by 'rulings' it meant *expositions of the law or the legal reasons upon which the courts rested their judgment* on the questions presented or the issues joined. . . .

It was harmony of doctrine and adjudication which this clause of the Constitution was framed to safeguard, . . ." (Our italics.)

Now the Kansas City Court of Appeals reversed the judgment (Knorp v. Thompson, Trustee, supra), being of the opinion that the plaintiff failed to make out a case for the consideration of the jury, and the evidence reviewed in the determination of that question was the evidence introduced *in both cases* (Knorp v. Thompson, Trustee, supra, and Hutchison v. Thompson, Trustee, supra). It seems clear that had the evidence in both cases been sufficient, in the opinion of the court of appeals, to make out a case for the consideration of the jury in the particular case (Knorp v. Thompson, Trustee, supra), the court of appeals would have found that the request for the peremptory instruction was properly refused. It may be that, had the court of appeals reviewed the evidence of the particular case only, it would have found the evidence insufficient and would have reached the same result (judgment of reversal). However, the judgment of reversal was not the result of the consideration of the sufficiency of the evidence introduced in the particular case only; for the court of appeals held that it should consider, and it did consider, the evidence introduced in both cases. Since the court of appeals considered the evidence of both cases in the review of the particular case, we are here concerned with the legal reason expounded, the principle of law announced, by the court of appeals as the basis for its holding that it should *also* consider the evidence introduced in the case of Hutchison v. Thompson, Trustee, supra, in the review of the particular case, Knorp v. Thompson, Trustee, supra. The principle of law so announced for so holding—the ruling upon which it based its judgment on the question presented—was a principle of law that "The court will take judicial notice of the evidence in a companion case. . . . The evidence in the present case may be supplemented but not contradicted by the evidence in a companion case." The principle of law so announced in so holding was, we believe, a ruling or "decision" of a court of appeals within the meaning of Section 6, Amendment of 1884, Article VI, supra. And so, we hold the "portion of the opinion" which Judge CAVE deemed to be in conflict with previous decisions of this court was a "decision" of a court of appeals within the meaning of the Section of the Amendment.

The motion for retransfer is overruled.

Although the action, Hutchison v. Thompson, Trustee, supra, a companion case, is for the wrongful death of a person who was killed in the same collision (while riding in the same automobile-truck) with the same train as was the plaintiff's husband in the case at bar, the Hutchison case is another action and distinct from the instant action. Courts do not ordinarily notice judicially the records and facts in one action in deciding another and different one. Thompson v. Scott, 323 Mo. 790, 19 S. W. 2d 1063; Smith v. Berryman et al., 272

Mo. 365, 199 S. W. 165; State ex rel. St. Joseph Water Co. v. Eastin, 270 Mo. 193, 192 S. W. 1006; Little Rock Trust Co. v. Southern M. & A. R. Co., 195 Mo. 669, 93 S. W. 944; Banks v. Burnam, 61 Mo. 76. See also 20 Am. Jur., Evidence, sec. 87, p. 105.

Of course a court *can* judicially notice its own records, and courts, when justice requires, should and *do,* in deciding a case, consider the records of other cases, as ". . . where the interests of the public in ascertaining the truth are of paramount importance, as also in cases where the court is seeking to determine what is a reasonable exercise of its discretion, or whether the present proceeding is merely a moot one. And 'there may be cases so closely interwoven, or so clearly interdependent as to invoke' a rule of judicial notice in one suit of the proceedings in another suit." 23 C. J., pp. 113-114; Thompson v. Scott, supra. See also 31 C. J. S., Evidence, sec. 50.

But it is just that a party should have the issues of fact of his case, or of his defense, decided, and the sufficiency of the evidence thereon reviewed, upon evidence lawfully introduced in the trial of his case, or defense, in the trial court. It is there that he has the opportunity to confront and cross-examine the witnesses who may testify against him and examine such documentary proof as may be introduced into evidence by the adverse party. It is only 'in the trial court that a party has an opportunity to rebut, impeach, or explain, if he can, such evidence as may be adverse to his cause. And a party may justly be required to introduce in the trial in the trial court the evidence upon which he depends to sustain his case, or defense, for there only the adverse party has the opportunity to confront the witnesses, examine the documentary proof and rebut, impeach, or explain such evidence as may appear adverse to him. It is not just that a court should, in deciding the issues of a case, consider evidence introduced in another and different case, and thus decide a case upon evidence which a party had been afforded no opportunity to refute.

The Kansas City Court of Appeals in its opinion (167 S. W. 2d at page 112) construes the case of Bloecher v. Duerbeck, 338 Mo. 535, 92 S. W. 2d 681, as ruling "that the evidence in the present case may be supplemented but not contradicted by the evidence in a companion case." Having so construed the Bloecher case, of course, it was the duty of the Kansas City Court of Appeals to follow that case, so construed, as the last previous decision of this court.

The Bloecher case was an action for personal injury, the result of an explosion of a heating plant. The plaintiff alleged negligence (1) the heating system was installed in a dangerous manner, in that there was no adequate provision for the escape of excessive pressure, and (4) the failure to equip the heating system with a suitable safety relief valve. This court held that the evidence was sufficient to submit the issue, (1) the heating system was installed in a dangerous manner.

There was "nothing in the evidence to show that the safety valve was inherently defective," and the trial court did not submit issue (4) to the jury. Defendant requested, and the trial court refused to give, an instruction withdrawing the latter issue (4) from the jury's consideration. This court held that the refusal to give the withdrawal instruction was proper, because the giving of the withdrawal instruction "would have confused the issues" submitted. There "was no evidence admitted concerning the safety relief valve 'which might easily lead to false issues.'" We believe this court ruled correctly, for the evidence showed that the safety relief valve was "a part of the system" the alleged negligent installation of which was submitted. The court did state that in another case "there was evidence tending to show that the safety relief valve was installed upside down"—*arguendo,* the defendant could not have been prejudiced by the refusal of the withdrawal instruction. But the opinion nowhere indicates that this court considered such evidence in determining the question of the sufficiency of the evidence to make out a submissible case on an issue submitted.

This court in the Bloecher case did not intend to hold, and, we believe, that case should not be construed to hold, that a court may take judicial notice of the facts of another and different case in deciding whether the evidence of a case is sufficient to make out a submissible issue.

In reviewing the evidence, from the viewpoint most favorable to plaintiff, that we may determine the question of whether submissible issues were made out in the case at bar, we will review the evidence admitted in the trial of the case at bar.

Plaintiff herein has alleged in her petition "that she is the widow of Henry H. Knorp, who departed this life on or about the 17th day of March, 1939, and filed her original petition hereon within six months of said date in the Circuit Court of Moniteau County, Missouri, to-wit, on the 12th day of September, 1939. Plaintiff further states that said suit was dismissed by plaintiff without prejudice on the 24th day of November, 1940."

Plaintiff did not support these allegations by proof, and defendant contends that plaintiff thereby failed to make a submissible case.

A cause of action for wrongful death was not generally cognizable at common law. The wrongful death statute, Section 3652, R. S. 1939, penal (and Section 3653, R. S. 1939, compensatory), creates a new cause of action. See Cummins v. Kansas City Public Service Co., 334 Mo. 672, 66 S. W. 2d 920. The statute created but *one* cause of action; however, the statute specifically names the dependents or beneficiaries, who may avail themselves of the cause of action, and the order in which and the conditions under which the various beneficiaries named may sue and recover upon the cause of action. Section 3656, R. S. 1939, Mo. R. S. A. sec. 3656, a statute of limitation (Cytron

v. St. Louis Transit Co., 205 Mo. 692, 104 S. W. 109), provides that "Every action instituted by virtue of the preceding sections of this article (including Section 3652, supra) shall be commenced within one year after the cause of action shall accrue." A saving clause in the latter section provides, "if any such action shall have been commenced within the time prescribed in this section" and a nonsuit thereof be taken, a new action may be commenced thereafter within a year. A plaintiff wife, who commences action more than six months after her husband's wrongful death, in order to establish a right of recovery under the statute should plead and prove *her* cause of action —that she had theretofore sued (appropriated the cause of action) within six months of the date of her husband's death (or within one year if there are no minor children); and if her action is commenced more than a year after her husband's wrongful death she should also plead facts which make the saving clause of Section 3656, supra, available to her. See Superior Minerals Co. v. Missouri Pac. R. Co., 227 Mo. App. 1044, 45 S. W. 2d 912, and cases therein cited.

The allegations of the petition in the case at bar are sufficient, for facts are stated which, if proved, would show that the plaintiff's original action was commenced (the cause of action appropriated) within the time (six months) as required in Section 3652, supra, and that a nonsuit was taken on a stated date. The petition in the instant action, being filed within a year of the alleged date of the nonsuit of the original action, was filed within the time provided in the saving clause of Section 3656, supra.

' Defendant did not in any manner make the specific contention in the trial court that these allegations of the petition were not supported by proof, so far as we are able to ascertain from the record. It appears that the issues tried and submitted in the trial court were the issues of negligence, and nowhere in the record is it shown that the defendant was making the contention that the plaintiff had not made a timely appropriation of the action or that the plaintiff's instant action was not commenced within the time provided in the saving clause of Section 3656, supra. Plaintiff's timely appropriation of the cause of action, and the timely commencement of the instant action after the nonsuit of the former action were essential to the plaintiff's recovery, but the case was tried in the trial court on the theory that there was no contention on these issues. The case upon appeal should be decided on the same theory. Consult State ex rel. Brotherhood of Locomotive Firemen and Enginemen v. Shain, 343 Mo. 666, 123 S. W. 2d 1, and State ex rel. Bush v. Sturgis, 281 Mo. 598, 221 S. W. 91. A request for a peremptory instruction in the nature of a demurrer to the evidence (in the refusal of which the defendant herein assigns error) may not be the basis of injecting into a case, after the case has reached the appellate court, the question of the sufficiency of the evidence to support an issue upon which there was no contention

in the trial court. Chinn v. Naylor, 182 Mo. 583, 81 S. W. 1109. See the case of Schrader v. Burkel (Mo. Sup.), 260 S. W. 63, an action for wrongful death, wherein this court in reviewing the case was searching the record to ascertain the legal grounds upon which the trial court had given a peremptory instruction. This court stated that the trial court "could well have given a peremptory instruction on the failure of the proof as to the bringing and pendency of the first suit, but we are impressed with the idea that both court and counsel proceeded upon the theory that the allegations of the petition were true in this respect. They should have made the record show the facts, however." But note in the Schrader case the contentions upon the issues of the plaintiff's appropriation of the action and of limitation were specifically raised by answer.

The main line of defendant's (appellant's) railroad approaches Elkhorn crossing from the northwest, the track for over one-quarter mile to the northwest being straight and so continuing to a point some distance southeast of the crossing. The track approaches this straight-of-way from the west by a curve to the right. Elkhorn (graveled) road, a public highway, intersects the defendant's tracks in a north-south direction; the angle of the northwest corner of the intersection being acute and of about 45°. At the crossing a spur track parallels the defendant's main line track at a distance of 29.5 feet northeast, measured at right angles from the center lines of the tracks; along the graveled portion of the roadway, as an automobile would travel, the distance between the tracks is 49 feet, measured from the north rail of the spur track to the south rail of the main line track; a bulk oil plant of the M.F.A. Oil Company is situate north of the spur track, west of Elkhorn road and south of an east-west graveled road extending from the city of California to the westward. The bulk plant building, 24 by 18 feet, fronts Elkhorn road at an angle; the building faces a little south of east. A loading dock, 11 by 4 feet is on the east side of the bulk plant building. The west margin of the gravel of Elkhorn road varies northwestwardly from the crossing to the south end of the loading dock. A (slightly leaning) telegraph pole stands 27 feet southeast of the southeast corner of the bulk plant building. Four storage tanks are located just to the northwest of the bulk plant building. The distance from the leaning pole, as an automobile would travel on Elkhorn road, to the center line of the main track is 110 feet. Another telegraph pole and a crossing warning sign are situate a few feet west of Elkhorn road and between the spur and main line tracks. U. S. Highway No. 50 lies southwest of and parallels the defendant's track, being 81 feet measured at right angles from the center line of the main track to the center line of the highway—the distance is 114 feet measured due south from the center of the main track. From a point in Elkhorn road 75 feet north of the spur track the roadway rises 1.9 feet to the spur track; from the spur

track to the main line the rise is 2.15 feet; and from the main line to the center line of U. S. Highway No. 50, the roadway falls 4.35 feet. Just south of the spur track at the crossing there is a place in the roadway which is relatively flat. The crossing was "pretty rough" at the time of the collision. From a point in Elkhorn road 75 feet north of the main line one can see along the main line track to a point 2138 feet to the northwestward. A roadway runs eastwardly between the spur track and main line; this roadway serves other bulk oil plants to the east of Elkhorn road.

Raymond Ehlert, agent for the M.F.A. Oil Company and in charge of its bulk oil plant, testified on behalf of plaintiff (respondent). The witness, in the afternoon of March 17th, a dry clear day, had loaded his tank truck at the loading dock of the bulk oil building preparatory to a business errand; plaintiff's decedent with two others came from the east on the north graveled road in a truck belonging to the city of California; the driver of the truck turned to the left into Elkhorn road, stopping the truck with the front about even with and east of the leaning pole. The truck, a Model A Ford of the year 1929 or 1930, had one seat with cab and low truck bed. Plaintiff's decedent, Henry H. Knorp, street commissioner of the city of California, was seated in the center; Harry Knorp, son of Henry H. Knorp, was under the steering wheel; and James E. Hutchison was seated on the right. All of the occupants of the city truck were killed in the subsequent collision. The occupants of the truck talked to witness about the purchase of some kerosene for the city and there was some general conversation for something less than ten minutes. A bottle of wine was passed; the witness took a drink, and the occupants of the truck "drank while they were there." After conversing as stated, witness got into his (tank) truck, went north about twenty-five or thirty feet, made a "U" turn and came back south on Elkhorn road, passing the city truck on the left and drove up on the crossing; before ▮▮▮▮ he approached to within ten feet of the main line, he noticed a train approaching at least a quarter of a mile away "beyond the block signals" (the block signals are 1278 feet to the northwest). Witness passed over the crossing and traveling about 15 miles per hour, turned right on U. S. Highway No. 50, and stopped about 350 feet from the crossing, 250 or 300 feet along U. S. Highway No. 50. Before stopping he looked back toward the crossing through the corner of the rear glass of the tank truck cab and saw "the truck Mr. Knorp was in

"Q. Now, as you went down that bank and turned and went west and slowed down and stopped, about how fast, in your judgment did you travel? A. Not over fifteen miles an hour.

"Q. From the crossing on? A. Yes, sir.

"Q. Then you consumed the time in stopping and pulling over on the shoulder? A. Yes, sir.

"Q. Did you get entirely over or partially off on it? A. I don't imagine I was completely on it.

"Q. Before you had stopped, had you looked back? A. I looked back through the rear glass.

"Q. In the rear end? A. The rear glass in my cab.

"Q. You have your tank back of that? A. Yes, sir.

"Q. Can you see? A. Through the corner of the glass, over the edge of the tank.

"Q. Did you look back towards the crossing or back east on Highway 50? A. I looked back towards the crossing.

"Q. Where were you, do you think, or how far were you from where you stopped, when you looked back through the glass towards the crossing? A. Oh, fifty feet, I imagine.

"Q. At that time did you see the truck Mr. Knorp was in? A. I did.

"Q. When you first looked back through the glass? A. Yes, sir.

"Q. I beg your pardon, I thought you pulled off to look back? A. I did. I looked back through the glass, saw the truck and pulling off and stopping at the same time, but I saw the truck in motion as I pulled off to stop and got out towards the running board; it all happened in a fraction you might say in less than a minute's time and I seen them pull up. I thought then on the spur track, but they weren't, they were pulling, I realized, on to the main line. . . . .

"Q. To refresh your memory, isn't that the situation, that you didn't see until you pulled over on the shoulder and stepped out? A. As well as I can remember, I could see, but I couldn't see clear what they were doing."

The city truck was moving about five miles per hour in the "best judgment" of the witness; he heard no whistle from the train; in his opinion the train was going 65 miles per hour. Witness did not see the collision:

"Q. . . . this view that you got of the truck, after you got down there on Highway 50, was the first and only glimpse you had of it from the time you passed it, as you came south, that is right? A. Yes, sir.

"Q. And that was just a momentary glance? A. Yes, sir.

"Q. Do you think the train was then 150 feet away from the crossing? A. Well, it could—it would be hard to say how long I had seen that truck, it all happened in the space of a half minute's time or less.

"Q. As a matter of fact, it happened in a second, didn't it? A. I imagine it did, yes, sir.

"Q. Now then, just how far would you say that the train was west of the crossing? A. Well, I don't remember seeing the train.

"Q. When you first saw that truck, after you got out on Highway 50? A. I don't remember seeing the train at that time, so I couldn't

say. At the time I was looking at the truck, except when it come between me and the truck.

"Q. If I understand your testimony, in a second's time after you saw the truck the train came along and cut off your view of everything? A. Yes, sir.

"Q. Are you able to state how far the train was west of the crossing at that time? A. It couldn't have been very far. I would say less than one hundred feet.

"Q. Now, are you able to state where the truck was at that time? A. Well, it must have been, when I seen it, right on the main line tracks.

"Q. At the time you first saw it? A. Yes, sir, or at least approaching the main line track.

"Q. In other words, do I understand you to say that when you looked back and got your first glimpse of this truck after you. had gotten down on Highway 50, you think it was right up at or on the main line track? A. It was right at it and approaching the main line track.

"Q. How close would you say? A. Oh, three or four feet."

There was evidence tending to show that the brakes of the city truck were in good condition and that it could be stopped within a distance of 5 or 6 feet when traveling 5 or 6 miles per hour, within a distance of 10 or 12 feet at ten miles per hour, and within a distance of 17 or 18 feet when traveling twelve miles per hour.

Train No. 16, a passenger train, consisted of an engine and eight cars or coaches on March 17th. Robert T. Cecil, engineer of the train on that afternoon, testified that the train, equipped with Westinghouse automatic braking equipment in good order, approached Elkhorn crossing moving at 65 miles per hour; that he saw an automobile cross the tracks when he was out of the curve just west of the whistling post. The witness did not see the city truck, he could not see to the north of the crossing after the train reached the whistling post, and the first thing he knew about the collision was when the fireman "hollered, then we came together," the train was then "right up pretty close to the crossing." He stated that the train could have been stopped if all brakes were put in emergency in about 1800 feet. The witness had testified, by deposition prior to the trial, that the train could have been stopped with all brakes, ". . . within about probably six or seven hundred feet." In explaining the testimony in the deposition, ". . . I had yards on my mind and he (the questioner) was talking about feet. That is why I answered it in that manner." The witness further testified that he began sounding the whistle at the whistling post and continued to sound the whistle until the collision; that it would take three or four seconds after the application until the brakes would have an effect on the motion of the train; and that, going 65 miles per hour the speed

could be reduced very little, if any, in 200 feet. The witness stated that he applied the brakes in service application upon the engine and the cars, but released the engine brakes, "I didn't want to derail the train."

Lynne E. Graves, who had been an engineer for the Union Pacific Railroad Company for a period of about twelve years, made sight tests while seated under the steering wheel in an automobile, at a point on Elkhorn road 88 feet north of the main track. In this position he could see about a hundred feet of the main line track "possibly a few feet over," and in moving up towards the crossing there was very little change in the sight distance, "the change was not improved."

There was other testimony introduced by plaintiff that no whistle was sounded, and that the train could have been stopped within 700 feet after the application of emergency brakes.

It appears that defendant's counsel stated to the jury in the opening statement that ". . . from a point 75 or approximately 75 feet, possibly more (north of the main line track), . . . the occupants of this truck . . . had an open and unobstructed view for quite a long distance to the west . .. ."; and ". . . The evidence will further be, gentlemen, that the fireman on this locomotive did see this truck as it came up from behind this oil station, saw its movements, saw it drive up to and across that spur track and thought they were going to stop; it will appear in evidence the speed at which it appeared to be moving at that time. . . ." The fireman did not testify.

The cause was tried on an amended petition alleging negligence under the humanitarian doctrine: failure to give an emergency warning, and failure to slacken speed or stop. The answer was a general denial. The original petition had alleged both primary negligence and humanitarian negligence.

The plaintiff introduced into evidence the answer to the original petition, which answer alleged in part, ". . . the driver of the said automobile-truck carelessly and negligently drove said truck from a place of safety to and upon the railroad track, in broad daylight, immediately in front of a rapidly approaching eastbound railroad train, without stopping, looking, or listening for said train, when, by the exercise of the highest degree of care, he could and would have seen and heard said train at all times after it reached a point at least one thousand feet west of the place where said automobile-truck was driven to and upon the railroad track, and in time thereafter, by the exercise of the highest degree of care, to have stopped said truck or swerved the same to one side, and thereby to have avoided a collision . . ." Further answering, ". . . the said Henry H. Knorp (deceased) saw, or by the exercise of the highest degree of care on his part could and would have seen, the train

approaching from the west at a high rate of speed in time thereafter, by the exercise of the highest degree of care, to have stopped said automobile-truck or caused the same to be stopped, or to have swerved said automobile-truck or caused the same to be swerved to one side, before going upon the railroad track, but that he carelessly and negligently failed to do so . . .''

Defendant assigns error of the trial court in admitting into evidence the portions of the answer to the original petition, contending that the defendant was entitled to follow plaintiff's changes of position without being harassed by any previous position taken by defendant in answer to a previous position taken by plaintiff. Defendant cites the cases of Blaine v. Huttig Sash & Door Co., 232 Mo. App. 870, 105 S. W. 2d 946; Kenefick-Hammond Co. v. Norwich Union Fire Ins. Soc., 205 Mo. 294, 103 S. W. 957; and John Deere Plow Co. v. Cooper, 230 Mo. App. 167, 91 S. W. 2d 145. The cases, Kenefick-Hammond Co. v. Norwich Union Fire Ins. Soc. and John Deere Plow Co. v. Cooper, hold that a defendant does not waive the right to assign error in the refusal of a request for a peremptory instruction by thereafter requesting instructions converse to those of plaintiff on the merits of the case. The case, Blaine v. Huttig Sash & Door Co., holds that a defendant is not deprived from urging in a common law action that the case is one cognizable only before the Workmen's Compensation Commission, although the defendant had been a party defendant to the proceeding originally filed before the commission, and the commission had decided that the case was not cognizable under the Workmen's Compensation Law. A defendant may invoke as many defenses as he has, and may not be deprived of this right by plaintiff, nor by an erroneous ruling of a court.

The answer to the original petition was not a mere formal pleading, but was a statement of facts. The facts stated were equivalent to an allegation that the driver of the truck and plaintiff's decedent were oblivious of danger. Crockett v. Kansas City Rys. Co. (Mo. Sup.), 243 S. W. 902; Woods v. Moffitt, 225 Mo. App. 801, 38 S. W. 2d 525; Allen v. Purvis (Mo. App.), 30 S. W. 2d 196; Hart v. Chicago M. & St. P. R. Co. (Mo. App.), 265 S. W. 116. Defendant abandoned the answer to the original petition upon the filing of the amended petition. An abandoned pleading is admissible in evidence against the party in whose behalf it was originally filed, if the pleading contains admissions or statements of fact against the interest of such party. Morgan v. Kroger Grocery & Baking Co., 348 Mo. 542, 154 S. W. 2d 44; Wahl v. Cunningham, 332 Mo. 21, 56 S. W. 2d 1052. The trial court correctly admitted the abandoned answer into evidence.

The constitutive facts of a humanitarian case are:

" '(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury . . .; and (5) by reason thereof plaintiff was injured.' Evidence tending to prove these facts makes a prima facie case for plaintiff. In some instances obliviousness of danger on the part of plaintiff is necessary to make the situation in which he is placed one of peril. In such cases it is of course incumbent upon the plaintiff to make proof of the facts and circumstances tending to show obliviousness, not only for the purpose of establishing that he was in a position of peril, but to bring home to defendant a knowledge of his peril. In these cases, however, obliviousness is but a subsidiary or evidentiary fact, the perilous situation of plaintiff. and defendant's knowledge of it are the ultimate, issuable facts." Banks v. Morris & Company, 302 Mo. 254, 257 S. W. 482.

Defendant had the duty to maintain a lookout · for persons approaching or upon the intersections of public highways and defendant's tracks. Womack v. Mo. Pac. R. Co., 337 Mo. 1160, 88 S. W. 2d 368; Hencke v. St. Louis & H. R. Co., 335 Mo. 393, 72 S. W. 2d 798. There should be evidence, therefore, tending to show that the defendant either knew or had constructive notice that the deceased was in a position of peril.

In the case at bar facts equivalent to obliviousness were admitted in the abandoned answer, introduced into evidence. In exemplifying the effect of obliviousness, under the decisions of this court, it is stated, "If the plaintiff is driving an automobile and has reached a position of such proximity to the path of the defendant's vehicle that even an immediate application of the brakes could not cause him to stop before the collision occurs, he is certainly in peril. . . . ¨if a plaintiff is approaching the pathway of the defendant on a course which, unless he stops, will produce a collision and if he is at the time oblivious to the presence and approach of the defendant, this in itself will cause him to be in a position of peril . . ." State ex rel. Thompson v. Shain, 349 Mo. 27, 1. c. 34, 159 S. W. 2d 582, 1. c. 586.

". . . The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume

that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing. However, . . . if there is anything in the demeanor or conduct of the plaintiff which to a reasonable man in the defendant's position would indicate that the plaintiff is inattentive and, therefore, will or may not discover the approach of the train, the engineer must take such steps as a reasonable man would think necessary under the circumstances. . . .'' Vol. II, Restatement of the Law of Torts, Comment b., sec. 480, p. 1259. Womack v. Mo. Pac. R. Co., supra; Poague v. Kurn, 346 Mo. 153, 140 S. W. 2d 13. See also State ex rel. Thompson v. Shain, supra; Thomasson v. Henwood, 235 Mo. App. 1211, 146 S. W. 2d 88.

Defendant's duty to use care to avert injury to another under the humanitarian doctrine arises only ''on (defendant's) discovery of peril or on negligence in discovering it when there is a duty to keep an outlook and make discovery of the peril.'' State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S. W. 2d 798. In the latter situation, under the humanitarian doctrine, a defendant ''To be free from negligence . . . must act on reasonable appearances and at a time when action would be effective.'' Allen v. Kessler (Mo. Sup.), 64 S. W. 2d 630. See also Perkins v. Terminal R. Ass'n. of St. Louis, 340 Mo. 868, 102 S. W. 2d 915, and Womack v. Mo. Pac. R. Co., supra.

Does the record show facts from which it may be inferred that the defendant (1) knew of or had discovered the peril of the deceased, or that the defendant (2) could have discovered the peril of deceased by the exercise of ordinary care at a time after which the defendant had the present ability, with the means at hand, to have averted the impending injury?

Since the peril of deceased arose from the fact that he was oblivious to the danger, there should be evidence tending to show, as we have stated, that defendant knew or had constructive notice of deceased's obliviousness, in time to have averted the impending injury.

(1) Did the defendant know of or discover deceased's peril in time to have averted the impending injury?

Plaintiff argues that the allegations of the abandoned answer that the driver of the city truck could have heard and seen the train when it was 1000 feet northwest of the crossing and that the occupants of the truck did not stop, look and listen must have been based upon information obtained from the fireman or engineer; consequently the allegations were, in effect, an admission that defendant knew of deceased's obliviousness at the time the fireman first saw the city truck. But, we believe, the defendant in good faith could and may have based the allegations of the abandoned answer upon the fact of the collision, in connection with a knowledge of the sight distances to the northwestward of the crossing. It is not reasonable that the city truck would have been driven upon the cross-

ing into the path of the train, under the circumstances, had its occupants heard or seen the approach and proximity of the train.

Plaintiff further argues that the defendant's failure to introduce the testimony of the fireman raises an inference unfavorable to defendant—that the triers of the fact could infer from such failure that the fireman would testify that he knew of the obliviousness of plaintiff's decedent from the time the truck "came up from behind this oil station." The burden of proof of negligence under the humanitarian doctrine is upon the plaintiff. Shepherd v. Chicago R. I. & P. R. Co. et al., 335 Mo. 606, 72 S. W. 2d 985. An inference drawn from defendant's failure to introduce the testimony of the fireman did not shift the burden of proof so as to relieve the plaintiff, on whom rested the necessity of establishing a prima facie case, from proving the material facts essential to the establishment of a prima facie case. 31 C. J. S., Evidence, sec. 156, p. 860; McClain v. Kansas City Bridge Co., 232 Mo. App. 1189, 116 S. W. 2d 253. See also Shidloski v. New York, C. & St. L. R. Co., 333 Mo. 1134, 64 S. W. 2d 259; Frohman v. Lowenstein, 303 Mo. 339, 260 S. W. 460; Bahl v. Miles et al., 222 Mo. App. 984, 6 S. W. 2d 661.

While it was stated by defendant's counsel that the fireman saw the city truck "as it came up from behind this oil station," and approached and crossed the spur track, counsel did not admit that the fireman knew or should have discovered that the deceased was oblivious, or admit facts from which it may be inferred that the fireman knew or should have discovered that the deceased was oblivious. And there is no evidence, we believe, from which it may be inferred that the defendant had notice of or had discovered the peril of deceased, prior to the time when, according to the testimony of the engineer, the fireman "hollered." However, there is no showing of the position of the truck or the engine with reference to the crossing at the time the fireman called to the engineer, except the engineer's testimony that the engine was then "Right up pretty close to the crossing." It would not be reasonable to consider this evidence as sufficient to submit the issues on a theory that the defendant knew, or discovered, the peril in time to have averted the collision.

(2) Could the defendant have discovered the peril of deceased by the exercise of ordinary care in time to have averted the impending injury?

We should ascertain if the evidence tends to show anything in the movement of the truck or the demeanor or conduct of its occupants which should have made it reasonably apparent to a reasonable man that the occupants were oblivious. Such evidence as was introduced in the case at bar relating to the movement of the city truck in its approach to the main track is to be found in the testimony of the witness, Ehlert.

Plaintiff contends that the testimony of the witness, Ehlert, tends to show that the city truck moved at the speed of 5 miles per hour to the main line track; this contention is based upon the opinion of Ehlert of the rate of speed the city truck was moving, and a construction of Ehlert's testimony that he saw the city truck at the spur at a time when the witness was moving along U. S. Highway No. 50 at the rate of 15 miles an hour, and again saw the city truck when the witness had come to a stop 50 feet further along the highway, at which time the city truck was "pulling, I realized, on to the main line." But the witness, throughout his testimony, fixes the position of the city truck at approximately the same place at the time, or times, he saw it. It seems that, if he saw the city truck twice, his first observation of it was a very indistinct one, ". . . I couldn't see clear what they were doing."

Assuming, but not deciding, that a showing of the movement of the truck from the spur track to the main line track at the rate of five miles per hour would be helpful to plaintiff's case, we think the testimony of Ehlert does not tend to show that the city truck moved from the spur track to the main line track at the rate of five miles per hour or at that rate of speed for any considerable distance. His testimony could not show the speed of the truck at any place or for any distance in the truck's approach, except at the place or for the distance at which he testified he observed the movement of the truck—when "it was on," or "3 or 4 feet from," the main line track. At that time (or times) the train was "I would say less than a hundred feet" northwest of the crossing. The testimony of Ehlert leaves the whole question to conjecture.

No other witness testified of the movement of the city truck in its approach to defendant's tracks; nor was there testimony ▇▇▇ that its progress was steady, or accelerated or decelerated at any point. It is true that, as the truck approached the "pretty rough crossing" upgrade and at an angle, the defendant's train was coming toward the crossing from the right-rear of the truck. The occupants of the truck could not have seen the train without looking back northwestwardly; however, this they should have done, and the enginemen were justified in assuming that the occupants of the truck would look and that the truck would be brought to a stop in a place of safety, until such a time as something in the movement of the truck or in the actions or conduct of its occupants made it reasonably apparent that the occupants of the truck were oblivious and that the driver did not intend to stop. There was nothing in the movement of the truck or in the demeanor or conduct of its occupants, shown in evidence from which, under the circumstances, it became reasonably apparent that the occupants of the truck were oblivious of the approach and proximity of the train; the evidence does not show when

the enginemen in the exercise of ordinary care should have discovered the peril of deceased; consequently, the jury could not have determined that the defendant had time thereafter to avert the impending injury.

Cases are cited by plaintiff in which recovery was allowed, and in which cases, plaintiff urges, the facts were in legal effect analogous to those of the case at bar. The cases cited were determined by the principles of law applicable to the particular facts, which were materially different from the facts of the instant case. Among others, plaintiff has cited the cases State ex rel. Thompson v. Shain, supra; Perkins v. Terminal R. Ass'n. of St. Louis, supra; and Womack v. Mo. Pac. R. Co., supra. In these cases the principles of law applicable to the facts are as those in the case at bar, but the evidence in each of these cases showed something in the movement of the automobile or in the actions or conduct of its occupants from which, under the circumstances, it should have been reasonably apparent that the plaintiff was oblivious of the approaching train. In the case of State ex rel. Thompson v. Shain, this court stated, "The court of appeals in the present case specifically found that the fireman could have seen that deceased was oblivious to the approach of the train because of *his continued progress toward the track at undiminished speed,* because of the presence of side curtains on the car, and because of certain other facts not specified in the opinion." (Our italics.) In the Perkins case the evidence showed that, starting from a stop, the plaintiff was "first moving about two miles per hour, then increased his speed until he was going between five and six miles per hour." In the Womack case the evidence "tends to show that the car continued at the steady speed of five miles per hour all the way up the muddy incline, which made a rise of 3 feet in less than 50 feet."

We hold that there was not sufficient evidence introduced in the case at bar to justify the submission of the issues to the jury.

Assignments of errors in the giving and refusal of instructions, not reviewed in this opinion, may be considered by counsel and the errors, if any be apparent, may be avoided upon retrial. The opinion will not be extended by a review of these assignments. Although the plaintiff failed to make out a submissible case, it is apparent from the record that the plaintiff upon a retrial could avail herself of evidence showing the movement of the truck as it approached the crossing. As stated, the fireman, who (it is admitted) saw the truck's approach to the crossing, did not testify; the fireman should be able to truly describe the movements of the truck and thus supply the evidence from which it may be determined when, under the circumstances, it became reasonably apparent that the occupants of the truck were oblivious. This being true, this court has the discretion in the interest of justice to remand the case for a new trial.

Markley v. Kansas City S. Ry. Co., 338 Mo. 436, 90 S. W. 2d 409. The cause should be reversed and remanded.

It is so ordered. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.