In the Matter of the ADOPTION of K. B. I. D., Appellant,

v.

V. M. G., Petitioner-Respondent.

No. 8621.

Springfield Court of Appeals.
Missouri.

July 31, 1967.

HOGAN, Judge.

This is an appeal from a decree of adoption. The subject is a little girl, not quite seven at this writing. The petitioner, who is the natural mother's aunt by affinity, has had care and custody of the child since she was six months old. The appellant is the mother of the child. A number of questions are raised here, principally whether the court had jurisdiction of the action, and whether the consent of the mother could be dispensed with on the ground that she had abandoned her child.

This is the second time the appellant's family affairs have been before this court. See In the Interest of J., Mo.App., 357 S.W.2d 197. Though neither the parties nor the issues involved were the same, the record filed in the first case is in many respects more informative than that before us now, and the question arises whether the record in the earlier case may be considered in determining the merits of this appeal.

As a general rule, courts will not judicially notice the records and facts in one action in deciding another and different one, because a party is entitled to have the merits of his case reviewed upon the evidence lawfully introduced at the trial of his claim or defense in the trial court, and a reviewing court should not decide a case upon evidence which a party has had no opportunity to refute, impeach or explain.[1] Nevertheless, exceptions are admitted, and the extent to which this general rule is strictly applied or relaxed depends largely upon considerations of expediency and justice in a particular case, as well as what it is the court undertakes to notice.[2] The case before us is an adoption proceeding. It is not only familiar law that the State itself has an interest in such cases, State ex rel. Earnest v. Meriwether, Mo., 270 S.W.2d 20,

Gordon R. Boyer, Lamar, for appellant.

Frieze & Crandall, Carthage, for petitioner-respondent.

1. Paridy v. Caterpillar Tractor Co., 7 Cir., 48 F.2d 166, 168–169 [2] [4]; Knorp v. Thompson, 352 Mo. 44, 52, 175 S.W.2d 889, 894; Hess v. Hess, Mo.App., 183 S.W.2d 560, 564; 29 Am.Jur.2d Evidence, § 58, pp. 90–92.

2. Funk v. C.I.R., 3 Cir., 163 F.2d 796, 800–801 [1] and authorities cited note 6; Knorp v. Thompson, supra, 352 Mo. at 52, 175 S.W.2d at 894 [4]; Thompson v. Scott, 323 Mo. 790, 796–797, 19 S.W.2d 1063, 1065 [2]; 29 Am.Jur.2d Evidence, § 59, pp. 92–93.

22 [1]; In re C., C., and C., Mo.App., 380 S.W.2d 510, 514 [1], but it is essential on this appeal to determine whether the mother's conduct, judged by what she has done over a period of several years, rather than by what she says, constitutes such abandonment or neglect as dispenses with the necessity of her consent. For these reasons, we think we not only can, but should, examine the former record for such information as bears on the merits of this case, and we have done so.

As material here, the facts are that K., the adoptee, was born August 3, 1960, to the appellant and her second husband, one H. The appellant also has one child of her first marriage, which she contracted at age fourteen. The history of appellant's first marriage is recited in the case report styled In the Interest of J., supra, 357 S.W.2d 197, and we need not repeat those facts here. The appellant was divorced in October 1959 from her first husband and married H., her second, in March 1960, at age seventeen. K. was born in August, and on October 19 appellant was divorced from H. The appellant was given custody of K. at the time of her divorce.

In March 1961, at the instigation of the appellant's mother, a petition was filed in the juvenile division of the circuit court of Barton County alleging that the appellant's two children were neglected and in need of care and treatment. The substance of the petition was that the appellant had left her children with her mother and had "absconded on March 1, 1961, with a truck driver, not her husband, headed for the State of Texas." The juvenile court made an interim order placing both children in custody of the appellant's mother, but it appears that K. was never actually in her grandmother's custody after January 3, 1961, for at a subsequent hearing involving the custody of both children, the grandmother testified that "K. was with me a little while, but B. [the appellant] was down there [near petitioner's home] staying and I thought maybe, you know, the baby was with them [petitioner and her husband] and

she has got a good home." The appellant's mother was asked on this occasion (July 24, 1961) "if it [was] the plan to leave this child K. with [petitioner and her husband]," and she answered, "Her Daddy has signed her over to them." On this same day, the juvenile division of the circuit court of Barton County (where appellant then lived) entered an order finding that K. was within its jurisdiction, and ordering that the adoptee be placed in custody of the petitioner and her husband, subject to all rights of visitation by the child's father, the appellant, and the maternal grandmother. During the period between the original hearing or series of hearings on the custody of the children in Barton County and the commencement of this action, the petitioner's husband died.

The appellant's activities during this period following her first divorce and during and after her second brief marriage can only be gleaned piecemeal from the records. Apparently, prior to and following the truck driver incident, she went from place to place and from job to job. There is mention in the earlier record of employment at a "truck stop" near Lamar, work at a cafe on Main Street at Webb City, being at Golden City with a "girl friend and her parents," and a job at a T.V. service center in Joplin. It is unnecessary to pursue the matter, however; whatever the reason for her rather disorganized life, it is evident that the appellant left both of her children wholly in the care of others.

How the adoptee originally came into the petitioner's custody is not entirely clear. The petitioner testified that K. had been brought to her home on January 3, 1960, but this is quite obviously an error, because K. was not born until August 3 of that year. At the adoption hearing, the appellant testified that custody of both children had been awarded to their maternal grandmother, but that after appellant's grandmother died "she [appellant's mother] couldn't take care of both the children so she gave K. to my aunt." At one of the custody hearings in Barton County, the grandmother testified,

as we have recited, that she saw no reason to object to or interfere with the petitioner's custody of the adoptee, since the appellant was living near the petitioner's home and the adoptee had a good home. One of the various agency reports (which are scattered throughout both records) indicates that the appellant and her second husband *asked* the petitioner to take K. and rear her. The appellant vigorously denied that she had ever consented to or even contemplated K.'s adoption; her statement at the adoption hearing was that "she [petitioner] had asked me several times, in fact, almost everytime I seen her, if I would let her adopt K., and I always told her no, that *sometime* I wanted K. back." (Our emphasis.) There is an exhibit in the record showing that in July 1961 K.'s father executed a written consent to the adoption, which he subsequently withdrew. The father explained his execution of this consent by saying he had signed it because the appellant said "it was the best." At the hearing on the adoption, the father stated that he opposed the adoption, but he has not appealed from the decree.

Though the juvenile division of the circuit court of Barton County denied petitioner the adoptee's custody "for purposes of adoption" upon the hearing of the neglect proceeding—a fact which the. appellant stresses—it is undeniably true that the petitioner has had the adoptee for all the time of which the child has any memory, without objection by the appellant, and that the petitioner (and her husband prior to his death) have supported and cared for the child without any contribution from either of the parents for a four-year period preceding the trial of this case. The petitioner admitted that appellant had refused to sign a written consent to the adoption, but said this was not because the appellant was unwilling, but only because, as the appellant had put it, "she didn't want the name if it goes into court." In any event, and without going into all the factual minutiae, it seems clear to us that the prospect of adoption had been discussed and considered by the parties well before this action was commenced, and had apparently been contemplated favorably by the appellant.

The trial of this adoption proceeding was conducted much as if it was merely a hearing upon the custody of the child. For the purposes of this background statement, the evidence presented, in addition to that we have summarized, was as follows: K., the adoptee, was shown to be six years old. She was described by the petitioner as being "nervous" but otherwise in good health. At trial time, she was in kindergarten at a local public school, "doing just fine." Those who had observed the child from day to day stated that she seemed to be normal, healthy and happy, and appeared to have very strong ties of affection to the petitioner.

V., the petitioner, was fifty-five years old at trial time. She and her husband had been married nearly thirty years prior to his death on May 24, 1964, and they had reared two sons, both of whom were married. The petitioner's health has been poor, and her means are somewhat limited, but she owns a good home and is able to meet her financial obligations promptly. The petitioner testified that she has made financial provision for the adoptee's education and support, as she put it, "if anything happens to me." V. is a member of the Reorganized Church of Jesus Christ of Latter Day Saints (Mormon) and enjoys an excellent reputation in the community in which she lives.

H., the adoptee's natural father, testified briefly. He testified that at trial time he was working "at Boeing" in Wichita, Kansas, and was attending college in the evening. When he was asked if he objected to the adoption, H. answered, "I won't consent." The evidence brought out that H. had not contributed to K.'s support at any time during the two years preceding the adoption hearing. H. testified that he could have done so, but did not because he and petitioner's husband had agreed petitioner's husband would support K. and claim her as

an exemption for federal income tax purposes. When he was asked if he had made efforts to visit his child, H. answered, "No, I have been there, but I have never talked." As we have said, H. at one time consented to the adoption, but later revoked his consent.

Much of the appellant's trial testimony consisted of assurances that she now had a stable domestic situation and had acquired a sense of responsibility which she had lacked in her extreme youth, when she had "headed for Texas" with the truck driver and her children had been declared neglected. The appellant testified that she had married one R. at Webb City, Missouri, in December 1961. She and her present husband live at Biloxi, Mississippi, where he is stationed as a "career man" in the Air Force. Since February 1965, the appellant has had custody of her elder child. Appellant at that time "asked" the grandmother for J., the elder daughter, and the grandmother, having custody of the child by order of the juvenile court of Barton County, had returned the child to the appellant. The appellant testified, as we have recounted, that she had always felt that "sometime" she "wanted K. back," and there was considerable evidence that the appellant now maintains a good home and leads a relatively orderly and conventional life. Other and

more specific facts will be noted, as material, in the course of the opinion.

The first point for discussion is appellant's argument that the juvenile court in Jasper County never acquired any jurisdiction of this proceeding because: 1) on July 26, 1961, the juvenile division of the circuit court found the adoptee to be a neglected child, and entered an order at that time retaining jurisdiction until K. reached her majority, and 2) the petitioner failed to obtain an order of the juvenile court in Jasper County transferring custody of the child to her for adoption, pursuant to Section 453.110, par. 1.[3]

■ The appellant has thoroughly mixed several distinct ideas in making this point, i. e., jurisdiction over the person, jurisdiction of the subject matter, pendency of another action, and improper venue, but the essence of her argument is that since the juvenile division of the circuit court of Barton County once found that K. was a neglected child within the meaning of Section 211.031, and by its order retained jurisdiction as provided by Section 211.041,[4] no other court could thereafter make any order affecting her status or custody. As we read the precedents, she is mistaken. The "subject matter" of which the juvenile court in Barton County retained jurisdiction was

3. All references to statutes and rules are to RSMo 1959, V.A.M.S. and V.A.M.R. Section 453.110, pars. 1 and 2, reads:

"No person, agency, organization or institution shall surrender custody of a minor child, or transfer the custody of such a child to another, and no person, agency, organization or institution shall take possession or charge of a minor child so transferred, without first having filed a petition before the circuit court sitting as a juvenile court of the county where the child may be, praying that such surrender or transfer may be made, and having obtained such an order from such court approving or ordering transfer of custody.

"This section shall not be construed to prohibit the placing of a child in a family home for care by any parent, agency, or organization or institution, if the right to supervise the care of the child and

to resume custody thereof is retained. If any such surrender or transfer is made without first obtaining such an order, such court shall have the right on petition of any public official or interested person, agency, organization, or institution, to inquire into the facts and to make such order as to the custody of such child as may be for the best interests thereof."

4. Which reads: "When jurisdiction over the person of a child has been acquired by the juvenile court under the provisions of sections 211.011 to 211.431 in proceedings coming within the applicable provisions of section 211.031, the jurisdiction of the child may be retained for the purpose of sections 211.011 to 211.431 until he has attained the age of twenty-one years, except in cases where he is committed to and received by the state board of training schools."

the adoptee's status as a neglected child, while the provisions of Section 453.010, par. 1,[5] conferred the authority to hear the adoption proceeding upon the juvenile division of the circuit court of Jasper County, where the petitioner lived and where K. actually was. State ex rel. Grimstead v. Mueller, 361 Mo. 92, 96–97, 233 S.W.2d 700, 701–702. There is no more substance, in our judgment, to the appellant's related argument that petitioner could not have had the actual and lawful custody of the adoptee for at least nine months prior to the entry of the decree, as required by Section 453.080,[6] because no preliminary order transferring custody had been made by the court in which the decree of adoption was entered. Granted that Section 453.110 is meant to put an end to the indiscriminate transfer of children for purposes of adoption, an *order* of transfer of custody under that section is not a prerequisite to lawful adoption. " * * [T]he custodial question presented to the court in decreeing adoption * * * is not whether there has been an order of a court of competent jurisdiction awarding custody of the child to petitioners during the minimum nine months' period, but rather is it whether custody of the child has been lawful and actual in the petitioners during that period. * * *" State ex rel. Dorsey v. Kelly, Mo., 327 S.W.2d 160, 165 [1]; In re Adoption of P. J. K., Mo.App., 359 S.W.2d 360, 367 [12]. The adoptee had been placed in the petitioner's custody by an express order of the juvenile division of the circuit court of Barton County. When the decree of adoption was entered on May 23, 1966, the petitioner's custody of the adoptee, albeit for limited purposes, had been lawful and actual since July 26, 1961, and that is all

Section 453.080 requires. This point must be ruled against the appellant.

The second point raised by the appellant is that the court erred in receiving evidence from one N., the petitioner's daughter-in-law, who testified in rebuttal on petitioner's behalf. The evidence complained of consisted of the witness' testimony that she had heard J., the appellant's elder child, say that appellant and her present husband had "real beer parties" in their home "all the time." This witness further testified that she had heard appellant's mother say appellant had written her a letter stating that appellant and her present husband "were about to split up due to the fact that he [appellant's husband] had sent his mother some money." This evidence was received for impeachment purposes after the appellant testified there was little or no drinking in her present home; and the grandmother had denied receiving any letter from the appellant indicating discord between the appellant and her present husband.

■ Though we are inclined to think for various reasons that the appellant is right in saying this evidence should not have been received, we are not inclined to assign much importance to the error. This is a court-tried case, and upon review we simply consider such evidence as we deem admissible and exclude from consideration the evidence improperly received. Linders v. Linders, 356 Mo. 852, 861, 204 S.W.2d 229, 234 [13]. The erroneous reception of evidence in this instance does not require reversal, but in any case we have wholly excluded the evidence objected to from any consideration on this appeal.

5. Which reads: "Any person desiring to adopt another person as his child may petition the juvenile division of the circuit court of the county *in which the person seeking to adopt resides, or in which the person sought to be adopted may be,* for permission to adopt such person as his child." (Emphasis added.)

6. Which provides: "If the court, after due hearing, is satisfied that the allega-

tions of the petition are true, that the person sought to be adopted, if a minor, has been in the lawful and actual custody of the petitioner or petitioners for a period of at least nine months prior to the entry of the adoption decree, and that it is fit and proper that such adoption should be made, a decree shall be entered * * *."

The appellant's final two points are 1) that the decree of adoption should not have been made because the petitioner is in poor health and is too old to be a suitable adoptive parent, and 2) that there is no substantial evidence to support a finding that the appellant had willfully abandoned her child for a period of at least one year immediately prior to the filing of the petition for adoption, so as to dispense with the necessity of her consent to this adoption. Since questions concerning the fitness of the petitioner and the welfare of the child are beside the point if no abandonment is shown, In re Adoption of J. M. K., Mo.App., 363 S.W.2d 67, 74–75 [8], we will consider these points in reverse order.

We would again emphasize that this is not a mere custody case. Adoption involves the dissolution of a constitutionally protected relationship,[7] and unless the parents consent, or there is a substantial showing of some condition dispensing with the necessity of consent, the court has no power to enter a decree of adoption. Adoption may not be decreed simply to enhance the moral and temporal welfare of the child.[8] The statutory condition relied on to dispense with parental consent in this case is that found in Section 453.040, par. (4), which provides:

"The consent of (sic) the adoption of a child is not required of * * *

(4) A parent who has for a period of at least one year immediately prior to the filing of the petition for adoption, either willfully abandoned the child or willfully neglected to provide him with proper care and maintenance."

As we have elsewhere indicated, the conduct of a parent which amounts to abandonment or neglect must have occurred during the year preceding the filing of the adoption, but because abandonment is a matter of intent, evidence of a parent's conduct, either before or after the statutory period, may be considered to determine the purpose and intent of the parent. In re Adoption of J., supra, 396 S.W.2d 257, 261–262. Otherwise put, the parent's intention must be gathered from an objective consideration of his or her behavior as a course of conduct. Anno., 35 A.L.R.2d 662, 664–665, § 2 (1954): Therefore, even though the sequence of events is difficult to follow in chronological order, and though it is somewhat repetitious to do so, we will again summarize the appellant's course of conduct relative to the care and custody of her second child.

In October 1960, after K.'s birth in August, the appellant was divorced from her second husband and was given custody of her child. From October 1960 to January 1961, the appellant left both her children with the maternal grandmother, who periodically left them in turn with *her* mother. The appellant was in and out of her mother's home, and went from place to place and from job to job. In January 1961, the adoptee was left with the petitioner and her husband. The evidence is in conflict as to whether the appellant at that time intended to relinquish the adoptee to the petitioner permanently, but the evidence indicates to us that that was probably her intention. The report or "home study" mandatorily required by Section 453.070 recites that the appellant and the adoptee's father *asked* the petitioner and her late husband to take and rear their child. The petitioner testified that the appellant was unwilling to execute a written consent to the adoption only because she didn't "want to have the name if it goes into court." On July 3, 1961, the adoptee's natural father executed a written consent to

7. Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62; In re Mayernik, Mo., 292 S.W.2d 562, 568 [2]; Katz, Foster Parents v. Agencies, 65 Mich.L.Rev. 145, 156–158 (1966).

8. In re Adoption of J., Mo.App., 396 S.W. 2d 257, 261 [1]; In re Adoption of J.M.K., supra, 363 S.W.2d at 74–75 [8]; Hartwig v. Hartwig, Mo.App., 333 S.W.2d 101, 102 [2]; In re Slaughter, Mo.App., 290 S.W.2d 408, 411–412 [5].

the adoption, and later testified he did so because the appellant "advised me it was the best." The appellant herself explained her frame of mind by saying that she had always felt that "sometime I wanted K. back."

On March 1, 1961, when K. was seven months old, the appellant "absconded" with the "truck driver." This led to the neglect proceeding. The juvenile division of the circuit court of Barton County made an interim order placing the adoptee in her grandmother's custody, but when it heard evidence touching the custody of both children in July 1961, it discovered that the petitioner already had the adoptee and simply recognized that fact in its record order.[9]

Between the time of this hearing in Barton County, which was held on July 24, 1961, and December 8, 1961, the appellant seems to have made fairly regular visits with her child in the petitioner's home. The appellant testified that from December 8, 1961, to May 1962, she and her present husband lived near the petitioner and that they visited K. regularly. In April 1962, the appellant and her second husband again appeared before the juvenile division of the circuit court of Barton County, apparently seeking modification of the court's earlier custody order, but this was refused, and the court ordered that K. remain in the petitioner's custody.

In May 1962, the appellant's present husband re-enlisted in the Air Force and went to Biloxi, Mississippi. The appellant remained with her husband in Biloxi for thirteen months, during which period she visited K. "just once." Appellant returned to Webb City, Missouri, in January 1963, where she lived for several months with her

third husband's mother awaiting her husband's return from Biloxi. We do not know the nature of her contact with the adoptee during this sojourn in Webb City; at the adoption hearing the appellant testified that from January 1963 to March 1963 the adoptee was in custody of the appellant's mother, but other parts of the record show that this is not true and the appellant may merely have been confused as to dates. After he left Biloxi, the appellant's present husband was transferred to Topeka, where he and the appellant lived for approximately two years. The appellant returned to Missouri "something like eight times" during the two-year period she lived in Topeka, but since the petitioner was difficult to contact by telephone there were "not very many" occasions on which she was able to see the adoptee. In February 1965, the appellant and her present husband took the appellant's elder child into their home, but there is no evidence that the appellant made even the most perfunctory attempt since April 1962 to regain custody of her younger child until after the adoption proceeding was commenced. "About the middle" of 1965, as nearly as we can follow, the appellant and her husband moved back to Biloxi. The petitioner testified that in the year preceding the hearing on the adoption, which was held on May 12, 1966, the appellant had visited her child only once. When the appellant was asked by her counsel about the total number of times she had visited her child since she moved to Topeka, she answered: "We have only been home this last time, last summer once was in the last, well, on last summer would be right, but before that, I was down very few more times than 13." The appellant's explanation of her decreasingly frequent visits with the adoptee is that the petitioner was difficult to contact

---

9. The following testimony by the grandmother appears of record in the first transcript:
"Q. Did you ever notify anybody about this transfer of custody of K.? A. Who was I supposed to notify.
Q. The Order of the Court of March 9th placed this J. with you and also the other child, K.?

A. K. was with me a little while but [appellant] was down there staying and I thought maybe, you know, the baby was with them and she has got a good home.
Q. Is it the plan to leave this child, K., with [petitioner and her husband]?
A. Her Daddy has signed her over to them."

by telephone, or that the petitioner was away when the appellant happened to be in the vicinity.

Though of course it was not primarily the appellant's duty to support her child, it is worth noting that she never made any inquiry to determine how the adoptee was being supported, and that the extent of her contribution toward her child's material welfare has been to send a Christmas present every year, and a birthday present, she "thinks." There is no record of any correspondence between the petitioner and the appellant. The petitioner herself testified that on a number of occasions the appellant made arrangements to visit K. but did not appear, and her testimony in this respect was borne out by the testimony of other witnesses, who said they had been in petitioner's home when she and K. anticipated visits by the appellant and the grandmother which did not materialize. Illustrative of the kind of contact appellant had with the adoptee when she did visit is the appellant's meeting with her younger daughter at Christmas in 1965. The appellant had her elder daughter with her in Webb City and met the petitioner and the adoptee. The appellant did not get out of the car but stated that "we sat there and talked * * * for a while. I hugged K. through the window."

The terms "willful abandonment" and "willful neglect," as used in Section 453.040, par. (4), have been very restrictively construed. In re Adoption of J., supra, 396 S.W.2d at 261 [3, 4]; Anno., 35 A.L.R.2d 662, 664–665, § 2. It is not necessary, however, to arrange and distinguish the various authorities for the purposes of this opinion; it is sufficient to say that the terms must be and are somewhat elastic, and the question whether there has been a willful abandonment or neglect in any given case is essentially a factual question. In re C., C., and C., supra, 380 S.W.2d at 514–516 [3, 4] [5, 6]; In re Adoption of P. J. K., supra, 359 S.W.2d at 366–367 [10, 11]. Without detailing all the inferences possible

from the evidence, our independent factual review convinces us that the appellant voluntarily committed the adoptee to the petitioner's care when the child was but six months old, quite probably with the understanding that the petitioner and her husband would adopt the child at some future time. Whatever may have been her inward mental reservation—that "sometime I wanted K. back"—she has left the child wholly in the care of others for over six years, and in our view of the case she has never seriously considered assuming the burdens and obligations of parenthood so far as the adoptee is concerned. The appellant's entire association with this child since April or May of 1962 has consisted of sporadic, short "visits" in the petitioner's home, when the appellant found it convenient. In our judgment the appellant has willfully abandoned the child within the meaning of Section 453.040, par. (4), and her consent to this adoption is not required.

The final point for consideration is the appellant's argument that petitioner's health is so uncertain, and her age so advanced, that she is not a suitable adoptive parent.

The petitioner testified that at trial time she was fifty-five years old, and the adoptee was five. The petitioner also stated that she had had a hysterectomy and it is necessary for her to have a "hormone shot" about once a month. In 1961, the petitioner developed a mental illness as a sequel to an automobile accident, and was obliged to undergo shock treatments at a hospital in Springfield, Missouri. This mental illness, petitioner testified, lasted about a year and a half, but since that time she has had no more trouble. The appellant, calling our attention to these facts, and to our opinions in such cases as In re G., Mo.App., 389 S.W.2d 63, and In re D., Mo.App., 408 S.W.2d 361, argues that the record shows the petitioner is unable to care properly for the adoptee.

Undoubtedly the fact that the petitioner is fifty years older than the adoptee, and the fact that the petitioner's

health is somewhat uncertain, militate against the adoption. As the appellant says, we have several times expressed the view that young children should, when possible, be cared for by individuals who are in good health and of such age as those who normally bear children. Nevertheless, our statutes do not prescribe a maximum age for adoptive parents, and in the absence of a statutory provision to the contrary, advanced age does not disqualify a prospective adopting parent. Re Adoption of Brown, Fla., 85 So.2d 617, 618, 56 A.L.R.2d 820, 822; 2 Am.Jur.2d Adoption, § 63, p. 911; 2 C.J.S. Adoption of Children § 8, p. 379. Whether or not the petitioner's age and the condition of her health were such as to disqualify her as a person with the ability properly to care for, maintain and educate the adoptee was primarily a matter for the trial court's judgment, and we are inclined to defer to his finding.

For the reasons indicated, the decree is affirmed.

STONE, P. J., and TITUS, J., concur.