**In Re J.M.C.; N.C., Appellant.**

**No. 97–FS–1784.**

District of Columbia Court of Appeals.

Argued Sept. 21, 1999.
Decided Dec. 9, 1999.

Christopher May, Washington, DC, for appellee.

Virginia R. Stith for appellant.

John M. Ferren, Corporation Counsel at the time the statement was filed, Charles L. Reischel, Deputy Corporation Counsel, and Sharlene E. Williams, Assistant Corporation Counsel, filed a statement in lieu of brief.

Before REID and WASHINGTON, Associate Judges, and BELSON, Senior Judge.

REID, Associate Judge.

■■■ In this case N.C., the biological mother of J.M.C., challenges the order of the trial court terminating her parental rights. She contends primarily that (1) the trial court "erred in terminating the mother's parental rights based on the factual findings in [a] prior neglect proceeding where the standard of proof is a preponderance of the evidence"; and (2) mental illness alone is not a proper basis for terminating parental rights, especially where the government fails to provide services to the mother to facilitate reunification. We conclude that the trial court based its decision on clear and convincing evidence presented at the termination of parental rights' hearing ("the TPR hearing"). Furthermore, we hold that in terminating parental rights, the trial court at least may take judicial notice of prior neglect proceedings for the purpose of providing related and relevant background information, whether or not the interested parent was a party to and represented by counsel during the neglect proceeding. In addition, we hold that where the interested parent was a party to and represented by counsel in the prior neglect proceeding, the trial court may consider and supplement related and relevant facts previously found in the neglect proceeding, provided that the trial court's decision terminating parental rights is based on clear and convincing evidence. We also con-clude that: (1) the mother's rights in this case were not terminated solely on the basis of her mental illness; and (2) the decision to terminate parental rights is controlled by the best interests of the child standard and the failure of DHS to facilitate reunification efforts between parent and child cannot defeat the issuance of a TPR order. Therefore, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

J.M.C. was born on September 15, 1992 at George Washington University Hospital ("GWU Hospital") where his mother, N.C., was a patient in the psychiatric unit. One week after J.M.C.'s birth, the District filed a neglected child petition and, after receiving affidavits from GWU Hospital medical personnel regarding the condition of N.C. and J.M.C., the trial court placed J.M.C. in shelter care in the custody of the District of Columbia Department of Human Services ("DHS"). On October 21, 1992, the trial court placed J.M.C. with J.L. and O.L.[1]

Testimony presented at the TPR hearing showed that N.C. had a thirteen-year history of mental illness and manifested an unwillingness to voluntarily take anti-psychotic medication for her illness, diagnosed consistently through the years as schizophrenia, paranoid type. Dr. Soo W. Han, Chairman of the Department of Psychiatry at Prince George's Hospital Center, and also an employee of St. Elizabeths Hospital serving as head of Child and Adolescent Inpatient Services, testified as an expert in adult psychiatry. Dr. Han treated N.C. at Prince George's Hospital from September 19–26, 1996. He stated that upon her arrival at the hospital, N.C. "was quite grossly psychotic, meaning that she was out of touch with her immediate surroundings and acted and talked as if she is

---

1. P.L., the brother of J.L. was thought at the time to be the biological father of J.M.C. He asked J.L. and O.L. to care for the child. Subsequently, paternity testing revealed that P.L. was not the father. A second putative father was also ruled out as the biological father. After P.L. was determined not to be the father, J.L. and O.L. expressed a desire to keep J.M.C.

living in different reality than most of us are living." N.C.'s "personal hygiene was very poor .... [B]ut her condition was rapidly improved after [Dr. Han] put her on anti-psychotic medication and in another two, three days she was pleasant." When N.C. was discharged from the hospital, "she was fully oriented" and Dr. Han saw no "imminent danger." However, N.C. refused to take with her the prescriptions for the prescribed medicine. According to Dr. Han, N.C. said: "She is not going to take it" and "She is going to arrange everything on her own."

Based upon medical records which he personally reviewed, Dr. Han recounted N.C.'s history of hospitalization, beginning in 1984 at the Springfield State Hospital where she was diagnosed with schizophrenia, paranoid type. Hospitalization also occurred in 1986 at the Washington Adventist Hospital and St. Elizabeths Hospital. During her 1986 hospitalization at Washington Adventist, her right foot and part of her left foot were amputated due to her exposure to cold weather during the winter when she failed to take her medication while she was not hospitalized. Between 1991 and 1996, N.C. was involuntarily admitted to various hospitals, including St. Elizabeths, Washington Adventist, Springfield State, GWU, and Prince George's. Dr. Han stated that N.C. had a tendency to sign out of hospitals "against medical advice," or, "as soon as she [left] the hospital ground, she did not adhere to her agreement" regarding her care. Dr. Han stated that N.C. also suffered from a "personality disorder, not otherwise specified."

In terms of N.C.'s future ability to care for J.M.C., Dr. Han declared: "[W]hen [N.C.] is actively psychotic, grossly out of contact with reality, it would interfere with her ability to mother[ ] the child or also cause potential serious harm for the baby ." Furthermore, based upon "[his] own first hand experience and description from other professionals," Dr. Han asserted that "[N.C.] was not able to even look

into her own physical safety .... A fair assumption that if you cannot look after yourself, it is very hard to look after small infant which requires a lot more than even looking after an adult." Ultimately, when asked whether to a reasonable degree of psychiatric certainty N.C. "may be safely trusted with the care and raising of a child," Dr. Han said: "No."

The second witness at the TPR hearing was Nicolette Hawkins, a social worker who was assigned to N.C.'s case during her employment with DHS from February 1996 to March 1997. Ms. Hawkins saw N.C. at Prince George's Hospital in September 1996. She portrayed N.C., who at the time was in restraints, as "extremely hostile, verbally abusive," and said she "used profane language ..., lunged up from her restraints as if she was going to half spit at me, called me a lot of profane names and we were asked to leave because she was totally incoherent." Ms. Hawkins acknowledged that despite her assignment to N.C.'s case, she had never tried to make contact with N.C. prior to seeing her in September 1996, because "I would say I wasn't familiar as to the process of the agency and I just never did it." Ms. Hawkins had no telephone number or address for N.C. Although N.C. called Ms. Hawkins once, she left no phone number or address where she could be reached.

The third and fourth witnesses at the TPR hearing were J.L. and O.L., the couple with whom J.M.C. had been placed since October 21, 1992. J.L. and O.L. had raised four grown children and had a seven-year-old adopted son. They encountered N.C. twice during visits between N.C. and J.M.C. arranged by DHS, and at least once at the courthouse. The initial encounter took place during the Summer of 1993. O.L. described N.C. as "verbally abusive to the social worker" but not to J.L. or herself. J.L. recalled N.C. saying, "[t]his is not J.[M.C.] This is not my baby." When J.L. gave J.M.C. to N.C. to hold, the baby cried. N.C. "started to become very agitated and ... very emotional with

J.[M.C.]." When J.L. took J.M.C. back, N.C. "started cursing at the social worker."

O.L. described J.M.C. as "very energetic," "robust" and "impulsive." She also stated that "[the child's] attention span is short" and J.M.C. can be "distracted." Therefore, "whenever [J.M.C. is] entrusted to do something, [O.L. has] to do it with [J.M.C.] to get [the child] to complete most of [the] tasks." J.M.C. has "improved greatly" from an educational point of view, but [J.M.C.] "gets easily frustrated" and has a tendency to want to give up rather than continue with an activity to completion.

J.L. recalled that during the second visitation between N.C. and J.M.C., N.C. "became again agitated and started cursing us and cursing at the social worker"; and asking why "[her] child [wasn't] relating to [her]." After a court encounter in 1994, N.C. called J.L. several times. Her primary topic, however, was P.L., J.L.'s brother who had been considered J.M.C.'s putative father until a paternity test showed he was not the father. J.L. also spoke with N.C. about two months before the TPR hearing. She was only interested in P.L. and why he had not called her. She did not inquire about J.M.C.

Both J.L. and O.L. testified that they wanted J.M.C. to become a permanent part of their family. N.C. was not present at the hearing, but was represented by counsel who presented no evidence in her behalf.

At the conclusion of the TPR hearing, the trial judge stated, *inter alia:*

> [M]ental illness per se is not sufficient grounds to terminate a parent's right.

But on the record in this case, we have far more than just the factor of mental illness. We have the consequences and repercussion of that mental illness. The court cannot ignore the facts of the repetitive nature of the hospitalizations and the inference to be drawn that once out of the hospital, frequently against medical advice, she does not follow through and take the medications to maintain her stability to be functional. With amputated parts of her legs, with being filthy and dirty in September of '96 when she wasn't even taking care of her own hygiene, I think those are factors on which a court can rely by way of inferences, if she can't take care of herself, she can't take care of a four year old child.[2]

And when we consider from '84 to '96 the number of repeated hospitalizations and the nature of her mental illness and the impact that it's had on her drifting though life, I take it, is almost beyond a reasonable doubt, not only clear and convincing evidence, that she has no capacity for taking care of this child.

The judge also indicated that the DHS social worker's lack of education and orientation was counterbalanced by N.C.'s greater interest in contacting P.L. than seeing J.M.C., and her unwillingness to care for herself so that reunification could be achieved.

In fashioning written findings and conclusions of law, the trial court relied on background material from the 1994 neglect proceeding[3] in its first three paragraphs of factual findings but then, in paragraphs four through eight, proceeded to make findings based upon testimony given at the TPR hearing by Dr. Han, Ms. Hawkins,

---

**2.** Amputated or partially amputated feet alone would not manifest an inability to assume parenting duties.

**3.** Although N.C. was not present for the neglect trial proceeding, she received proper notice and was represented at the hearing by counsel. The Honorable Curtis Von Kann, who presided over the neglect proceeding, based his findings and conclusions on the

testimony of four witnesses: Dr. Ellen Minerva, a resident in psychiatry, Ms. Kathryn Rochlin Johansen, a registered nurse and Ms. Marjorie Swett, a social worker, all employed by the George Washington University Medical Center; and Ms. Erica Gants, a Ph.D candidate in psychology who was then an intern with a District agency mental health program.

J.L. and O.L. In the major paragraph regarding its conclusions of law, the trial court stated in part:

> This court is satisfied by the clear and convincing evidence standard that more than sufficient evidence was presented at the TPR trial to justify terminating the birth mother's parental rights as being in the best interest of the child in this case. While mental illness *per se* will not justify terminating parental rights, when it has been chronic, persistent and of long duration [as] here, at least since 1984 to the present, and is sufficiently severe that it affects the ability of the person to even take care of herself when psychotic, and when that person will not stay on the medication regime necessary to function, then a court may terminate the parental rights, when the aggregate of factors clearly and convincingly establish an inability to care for and parent a small child. That is the situation here and the law justifies termination of her parental rights not simply because there is mental illness, but based on the nature and severity of that mental illness and the impact it has on the parenting ability and functions necessary to raise a small child.... The evidence here, based on Dr. Han's testimony, is overwhelming that the capacity to take care of [J.M.C.] is almost nil. Based on the mental health history of the birth mother here over 13 years, to place J.M.C. in her custody would be to subject [J.M.C.] to a grave risk of endangerment to ... physical and emotional care and would unnecessarily subject [J.M.C.] to a high risk of harm.

## ANALYSIS

 "Our scope of review of the trial court's order terminating parental rights of a non-custodial parent is limited to whether the decision is supported by clear and convincing evidence in the record ." *In re A.C.*, 597 A.2d 920, 926 (D.C.1991) (citing *Appeal of U.S.W.*, 541 A.2d 625, 627 (D.C.1988)). "Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt."[4] *In re K.A.*, 484 A.2d 992, 995 (D.C.1984) (citing *Addington v. Texas, supra*, note 4, 441 U.S. at 423–24, 99 S.Ct. 1804). In reviewing this matter, we are also guided by the standard that: "[t]he trial court's determination of where the best interest of the child lies may be reversed only for an abuse of discretion." *In re A.C.*, 597 A.2d at 926 (quoting *Appeal of S.M.*, 589 A.2d 1252, 1257 (D.C. 1991)).

## Judicial Notice of the Neglect Proceedings

N.C. contends, first, that the trial court "erred in terminating the mother's parental rights based on the factual findings in [a] prior neglect proceeding where the standard of proof is a preponderance of the evidence." During the TPR hearing, J.M.C.'s guardian *ad litem* asked the court to "take judicial notice of ... all of the orders in the neglect file." Counsel for N.C. objected to the court's taking judicial notice of "the facts that are in the underlying neglect case" but had "[no] problem with the court judicially noticing the conclusion." The objection was based on the preponderance of evidence standard governing neglect proceedings in contrast to the clear and convincing standard applicable to termination of parental rights proceedings. In response, the trial court overruled the objection and stated: "[T]he document will be received subject to, of

---

**4.** In reviewing this case,

> we must satisfy the concern that there is sufficient record evidence such that the possibility of an erroneous judgment does not lie in equipoise between the two sides (the preponderance standard). On the other hand, we need not require the evidence to

> be so compelling so as to exclude as nearly as possible the likelihood of a decision that erroneously terminates parental rights.

*In re K.A., supra*, 484 A.2d at 996 (citing *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)).

course, the court properly applying the correct legal standard as augmented by what's presented at the TPR here[,] and any findings of facts that are proved beyond, not only by a preponderance but beyond, or at least a clear and convincing evidence standard has, in fact, been met." N.C. asserts that the trial judge "extensively adopts the neglect Findings of Fact and cites specific diagnoses of the mother that were not presented by an expert witness at the TPR trial. . . ."

In *S.S. v. D.M.*, 597 A.2d 870 (D.C. 1991), we considered an identical challenge to the trial court's "judicial notice of and rel[iance] on findings of fact in a prior neglect proceeding where the evidentiary standard was only a preponderance of the evidence." *Id.* at 871. In that case, however, unlike the case before us, appellant's counsel did not raise an objection, and our conclusion was based in part on the lack of objection. We stated: "[W]e are satisfied that the judge, after reciting the allegations of the neglect petition and summarizing the court orders in the neglect proceeding, by way of background, based virtually all of his findings of fact on the evidence that he heard at the show cause hearing and on the orders in the neglect proceeding to which appellant's counsel interposed no objection." *Id.* at 883.

■ "In general, a judge may take judicial notice of the contents of court records." *S.S. v. D.M., supra,* 597 A.2d at 880 (citing *Mannan v. District of Columbia Board of Medicine,* 558 A.2d 329, 338 (D.C.1989)). Nonetheless, "as a general rule, courts will not judicially notice records and facts in one proceeding in deciding another proceeding." *Id.* (citing *In re Adoption of K.,* 417 S.W.2d 702, 704 (Mo. Ct.App.1967)). "There are exceptions, and in appropriate cases, a judge may take judicial notice of the contents of court records in a related prior proceeding." *Id.* (citations omitted). This is particularly true where, as in this case, the interested parent was a party to and was represented by counsel in the prior neglect proceeding.

■ We now hold that in terminating parental rights, the trial court at least may take judicial notice of prior neglect proceedings for the purpose of providing related and relevant background information, whether or not the interested parent was a party to and represented by counsel during the neglect proceeding. In addition, we hold that where the interested parent was a party to and represented by counsel in the prior neglect proceeding, the trial court may consider and supplement related and relevant facts previously found in the neglect proceeding, provided that the trial court's decision terminating parental rights is based on clear and convincing evidence. What we said in *S.S. v. D.M., supra,* is applicable to our holding in this case:

When a trial court decides to terminate parental rights or rules that a child has been neglected, these conclusions of law (sometimes called findings of ultimate fact) respectively require different standards of proof: clear and convincing evidence (termination) and preponderance of the evidence (neglect). This is not to say, however, that each of the subsidiary facts underlying the ultimate disposition must necessarily be supported by the same standard of proof that sustains the ultimate fact/conclusion. For example, there may be twenty facts, each proved by a preponderance of the evidence, that in the aggregate create clear and convincing evidence of the need for termination of parental rights. Therefore, it is not necessarily true, as appellant's argument implies, that none of the facts found in a neglect proceeding can be used in the termination proceeding unless each so-called neglect fact is proved by clear and convincing evidence.

597 A.2d at 882 n. 32.

To make a categorical distinction between facts underlying a neglect proceeding and facts introduced in a TPR hearing may well pose undue obstacles to the ap-

plication of statutory factors which control whether termination of a parental right is in the best interests of the child. The statutory factors are set forth in D.C.Code § 16–2353(b) which provides in pertinent part:

(b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent. . . .

■■■ Understanding the child's need for continuity of care may require knowledge of the child's history since birth, which may be gleaned, at least in part, from evidence presented at the neglect hearing. Moreover, an evaluation of the quality of the child's interaction with a parent may also require reference to related and relevant factual material from the neglect proceeding. In addition, § 16–2354(b) specifically states in part: "A motion for termination of the parent and child relationship may be filed only when the child who is the subject of the motion has been adjudicated neglected at least six (6) months prior to the filing of the motion . . . ." This provision establishes a direct relationship between the neglect proceeding and the termination of parental rights. Thus, to a certain extent, what occurred during the neglect proceeding is related and relevant to the ultimate step of termination of parental rights. Nonetheless, the factual findings of a neglect proceeding alone may not serve as the basis for an order terminating parental rights. Section 16–2359(f), pertaining to the TPR hearing, states that:

A judge may enter an order permanently terminating the parent and child relationship after considering all of the evidence presented and after making a determination based upon clear and convincing evidence that termination of the parent and child relationship is in the best interest of the child. If a judge does not find that sufficient grounds exist for termination, the motion for termination of the parent and child relationship may be dismissed.

There can be no doubt that the factual basis for the TPR order must rest upon clear and convincing evidence, rather than a preponderance of the evidence.

■■■ In this case, the trial court clearly based its TPR order upon clear and convincing evidence presented at the TPR hearing. O.L.'s testimony recounted J.M.C.'s educational and other special needs, and [J.M.C.'s] integration into her family and bonding with the adopted son of O.L. and J.L. Dr. Han's testimony centered on N.C.'s mental and emotional health, her persistent diagnosis of schizophrenia, paranoid type, her "personality disorder, not otherwise specified," and her steadfast refusal through the years to voluntarily take anti-psychotic medicine. In terms of the interaction between N.C. and J.M.C., O.L. and J.L. recounted unsuccessful visitation efforts between N.C. and J.M.C. in 1994. Most compelling, however, was J.L.'s testimony that in his later contacts with N.C., her major preoccupation centered on his brother, P.L., and her desire to resume a relationship with him. As the years passed, N.C. did not articulate a similar desire for a relationship with J.M.C.

In short, substantial and compelling evidence rising to the level of clear and con-

vincing evidence was presented at the TPR hearing to support the trial judge's decision to terminate N.C.'s parental rights. The factual findings of the neglect proceeding were used as background information. In addition, consistent with our holding in this case, the trial court appeared to consider and supplement related and relevant facts previously found in the neglect proceeding to which N.C. was a party and represented by counsel, but the ultimate basis for the trial court's termination of parental rights in this case, however, as it must always be, was clear and convincing evidence.[5]

In her second argument, N.C. maintains, in essence, that her parental rights were terminated solely because of her mental illness and that her parental rights could not be terminated because DHS failed to facilitate reunification efforts with J.M.C. She is mistaken. The trial court unequivocally stated in its oral conclusions: "Mental illness per se is not sufficient grounds to terminate a parent's right." This principle was reiterated in the court's written conclusions which emphasized that:

> While mental illness *per se* will not justify terminating parental rights, when it has been chronic, persistent and of long duration [as] here, at least since 1984 to the present, and is sufficiently severe that it affects the ability of the person to even take care of herself when psychotic, and when that person will not stay on the medication regime necessary to function, then a court may terminate the parental rights, when the aggregate of factors clearly and convincingly establish an inability to care for and parent a small child. That is the situation here and the law justifies termination of her parental rights not simply because there

is mental illness, but based on the nature and severity of that mental illness and the impact it has on the parenting ability and functions necessary to raise a small child. . . . The evidence here, based on Dr. Han's testimony, is overwhelming that the capacity to take care of [J.M.C.] . . . is almost nil.

Clearly, then, N.C.'s mental illness alone was not the cause of the trial court's TPR. *See E.C. v. District of Columbia*, 589 A.2d 1245, 1250 (D.C.1991) ("[W]hile mental illness is not itself an adequate ground for termination of parental rights, the trial judge could properly consider the effect of [the parent's] mental condition on the welfare of the children.") (citation omitted).

■ Nor can the TPR order be vacated because of DHS's alleged failure to facilitate reunification. Undoubtedly, Ms. Hawkins failed in her duties as the DHS social worker assigned to N.C.'s case. Although Ms. Hawkins began her employment with DHS in February 1996, she candidly admitted that she made no effort to contact N.C. before September 1996 because "[she] wasn't familiar as to the process of the agency and [ ] just never did it." Although candid, her admission is a testament to professional shortcoming. Nonetheless, in *In re A.C., supra*, we made it absolutely clear that in termination of parental rights cases, the best interest of the child is the controlling legal standard, 597 A.2d at 925, and neglect of duty by DHS personnel will not defeat the issuance of the TPR order:

> As desirable as it might be, appellant's due process rights do not include as a condition precedent to termination of parental rights that the state agency

**5.** As the Supreme Court of Connecticut stated in *In re Juvenile Appeal (84–AB)*, 192 Conn. 254, 471 A.2d 1380 (1984):

> In considering the termination of parental rights petition, although the trial court may not rely on the *finding* of neglect, the trial court may rely on the *evidence* that warranted a finding of neglect. In dealing with the neglect petition, however, the court

> views the evidence from a fair preponderance of the evidence standard whereas when dealing with the termination of parental rights petition the court views the same evidence, together with any other evidence presented, from a clear and convincing evidence standard.

*Id.* at 1387.

having custody of a minor child make affirmative efforts to reunite the family. The statute in this jurisdiction which governs proceedings to terminate the parental rights of neglected children ... contains no express requirement that the agency having custody of a neglected child demonstrate that it has made reasonable efforts to reunite parent and child before the government or a guardian, acting on behalf of the child, can institute termination proceedings nor before the court can decide such cases.

597 A.2d at 923. We adhere to this position because "the overriding consideration is the best interest of the child, which may compel the filing of a motion to terminate parental rights regardless of the defaults of public agencies in seeking reunification of the family." *Id.* at 925. This is not to say that the reunification efforts of DHS are totally irrelevant. To the contrary, "the effort of the public custodial agency to reintegrate the family is a relevant factor in the decision-making process in a proceeding to terminate parental rights." *Id.* at 926. However, the "termination of parental rights is not precluded solely because the custodial agency has failed in its responsibility to make efforts to reunify the family." *Id.*

 Admittedly, "termination of parental rights is an extreme remedy ." *In re L.L.*, 653 A.2d 873, 890 (D.C.1995). Our case law interpreting § 16–2353(a) leaves no doubt, however, that in a TPR hearing and order " 'the best interests of the child' [is] controlling." *In re M.M.M.*, 485 A.2d 180, 184 (D.C.1984); *E.C., supra,* 589 A.2d at 1249. Applying the best interests of the child standard, the trial court concluded that, in contrast to the biological mother's situation, J.L. and O.L., with whom J.M.C. had lived since October 1992, "have much to offer this child." After summarizing the careers of J.L. and O.L., including O.L.'s sixteen years as a "certified Day Care Provider, with specialized training in child care development," the court determined that:

They provide ... stability and the opportunity for emotional [and] physical ... development of [J.M.C.] which could make [the child] a very productive member of society. They provide [J.M.C.] with that permanency children so vitally need[ ] to grow up as healthy and wholesome individuals and not as children at-risk, whom we fear as future juvenile delinquents and criminals.

" 'Application of the best interests of the child standard in a particular case presents one of the heaviest burdens that can be placed on a trial judge.... In reviewing this difficult decision, we will reverse only for an abuse of discretion.' " *In re Baby Boy C.,* 630 A.2d 670, 683 (D.C.1993) (quoting *In re D.I.S.,* 494 A.2d 1316, 1323 (D.C. 1985) (citations omitted)); *see also In re K.I.,* 735 A.2d 448, 456 (D.C.1999). We are satisfied that the trial judge did not abuse his discretion in this matter.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*