In re ANTJ.P., Mi.P., Ma.P., & Anth.P.

A.R. & L.P., Appellants.

Nos. 00–FS–1663 to 00–FS–1665 and 00–FS–1681.

District of Columbia Court of Appeals.

Argued Nov. 19, 2002.

Decided Dec. 19, 2002.

Marion E. Baurley, Washington, DC, appointed by the court, for appellant A.R.

Robert S. Becker, Washington, DC, appointed by the court, for appellant L.P.

Sheila Kaplan, Assistant Corporation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief for appellee District of Columbia.

Before FARRELL, RUIZ and REID, Associate Judges.

REID, Associate Judge:

In this case, the biological mother of four children, and the biological father of one of those children, challenge the trial court's decision to terminate their parental rights. We affirm, concluding that the trial court's decision to terminate their parental rights is supported by clear and convincing evidence, and that the trial court did not abuse its discretion in determining that termination of parental rights is in the best interests of the children.

## FACTUAL SUMMARY

The record before us shows that L.P., who had a history of substance abuse, burned her son, Anth.P. with a heated knife on November 27, 1996, when she caught him playing with the stove. He was taken to Children's Hospital with "multiple second degree burns on his arms and stomach, chin and neck." Burns also were found on his back, and "multiple well-healed scars [were noted] on his trunk and legs."[1] Subsequently, all four of L.P.'s children were removed from her home and placed in shelter care, with the District of Columbia Department of Human Services ("DHS").[2] On May 20, 1997, they were committed to the jurisdiction of the Child and Family Services Agency ("CFSA"), and placed in foster care.

Initially, CFSA pursued a goal of reunification of L.P. with her children; intensive reunification efforts were made by a contract agency, Family and Child Services ("F & CS"). In August 1997, when the initial intensive reunification efforts proved unsuccessful, L.P.'s case was turned over to another social worker at F & CS, Mari Iskowitz,[3] a reunification permanency planning worker, who continued "intensive reunification [efforts] . . . with a little bit more intense pressure." L.P. signed "service reunification agreement[s]" with Ms. Iskowitz. She completed prescribed parenting classes, but although individual therapy was arranged for her, L.P. attended those sessions "on a relatively sporadic basis," that is, "about 60 percent of the time." Through F & CS, L.P. entered the Job Corps, "but . . . was re-

---

1. L.P. entered a plea of guilty to five counts of child abuse.

2. At the time of the November 27, 1996 incident, L.P.'s four children lived with her. Anth.P. was five-years-old; Antj.P. was one-year-old; and twins Mi.P. and Ma.P. were two-years-old. Except for the twins, the chil-

dren have different biological fathers. D.C. is the father of Anth.P.; E.C. of the twins; and A.R., the only man to file an appeal, is the putative father of Antj.P.

3. Ms. Iskowitz' name also appears in the record as "Mary Jane Iskowich" and "Itsowitz."

leased ... due to a positive drug test."[4] Since L.P. lived in her boyfriend's mother's apartment, F & CS attempted to help her obtain appropriate housing, but L.P. did not cooperate.

Because L.P. did not make a "substantial effort ... to truly reunite with her family," CFSA decided that the goal of adoption was in the "best interests of the children," and the guardian ad litem moved for a termination of parental rights ("TPR"). On November 5, 1999, the trial court determined that D.C. (the alleged father of Anth.P.),[5] E.C. (the father of Mi.P. and Ma.P.) and A.R., (the father of Antj.P.) had all been served properly with the TPR notices. None of the fathers sought to visit his child(ren), and L.P. later indicated that she did not want to visit her children, allegedly because the agency told her that the children became "traumatized" when she visited them.

On June 8–9, 2000, the trial court proceeded with a TPR hearing for all four children instead of an announced show cause hearing. The father of the twins, E.C., and A.R., the father of the youngest child, were present and represented by

counsel.[6] After the hearing, the court terminated all parental rights.

## ANALYSIS

 L.P. contends that DHS and F & CS "failed to provide adequate services geared to her special needs" so that she could be reunited with her children. She claims that D.C.Code § 7–1301.02 (2001) required DHS to provide such services because she is "borderline mentally retarded." As the District points out, this argument "is being made for the first time on appeal," and we are not required to consider it. See Miller v. Avirom, 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967) ("Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal.").[7]

"A trial court may terminate the parent-child relationship when it determines, on the basis of the evidence presented and after due consideration of the best interest of all parties, that the termination is in the best interest of the child." In re Tw.P., 756 A.2d 402, 407 (D.C.2000) (citations

---

**4.** L.P. testified at the June 2000 termination of parental rights hearing that she had completed the Job Corps orientation program on May 1, 1998, received a Certificate of Achievement on May 8, 1998, and a service award on May 22, 1998.

**5.** During a hearing on May 1, 2000, the trial court noted that a paternity test confirmed that D.C. was not the father of Anth.P.

**6.** E.C. was anxious to proceed with the TPR hearing, rather than a show cause order, and the others present, including A.R., did not object.

**7.** Even assuming that this issue had been raised properly in the trial court, L.P. could not prevail on her argument. D.C.Code § 7–1301.02, et seq. relates to persons who are

mentally retarded. Section 7–1301.03(19) defines "mentally retarded" as:

> [A] significantly subaverage general intellectual level determined in accordance with standard measurements as recorded in the Manual of Terminology and Classification in Mental Retardation, 1973, American Association on Mental Deficiency, existing concurrently with impairment in adaptive behavior, which originates during the development period.

The record on appeal reveals no evidence supporting a diagnosis of mental retardation in accordance with this statutory provision. Nor is there any indication that L.P. requested special services due to limitations in her intellectual capacity. Significantly, she completed her parenting classes without apparent difficulty, and was doing well in the Job Corps until she used drugs.

omitted). "The trial court's decision to terminate parental rights must be supported by clear and convincing evidence ...," *id.* (citation omitted), and "may be reversed only for an abuse of discretion," *id.* (citations omitted). Moreover, D.C.Code § 16–2353(b)(2001) sets forth several factors that the trial court must consider before deciding to terminate L.P.'s parental rights.[8]

■ Here, the trial court found that Antj.P., Mi.P., and Ma.P. had been in the foster care system for almost their entire lives and that they "are doing well ... in their current placements." It further determined that Anth.P. "specifically requested not to see [L.P.], [then] wanted to see her on one occasion and has not wanted to see her since." It acknowledged that L.P. visited her children until sometime in 1999, but also credited the testimony of her social worker that the "visitation was not always consistent," and that since her visitation ended, her "children ... ha[d] not inquired about their mother." L.P.'s testimony that she brought Mi.P., Ma.P. and Antj.P. "gifts of clothing and toys during her visits" was found not "to be credible." On the contrary, the court concluded that L.P. generally had failed to "provide any financial assistance toward the maintenance of any of her children" since 1995.

Furthermore, the record supports the trial court's finding that L.P. did "not engage[ ] in any meaningful effort to demonstrate her readiness to become a full participant in the children's lives [a]s ... [she] was unemployed and living with her boyfriend and his mother, and thus was plainly not in a position to either assume or to assist with the children's maintenance and care." In contrast, the children's respective caretakers have "consistently met" their needs and have "appropriately responded to" the "chronic asthma, and some developmental delays" that afflict the twins and Antj.P. And, the children in turn are "adjusted and fully integrated into their homes and communities." The twins and Antj.P. are "very close and bonded to each other" and "are living together and will be adopted together." The trial court specifically found that Anth.P.'s "best interests—that is [his] physical, emotional, mental and educational well-being, dictates continuation of [his] current placement[ ] with caretakers who have demonstrated both a readiness and

---

8. That statute requires the following factors be considered:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;

(3A) the child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child;

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and

(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided .... Evidence of continued drug-activity shall be given great weight.

a willingness to provide [him] with a safe, loving and permanent home."

■ L.P. faults DHS for its reunification efforts and its decision to abandon the reunification goal. We conclude that the change in goal was appropriate under the circumstances of this case. *See In re P.S.*, 797 A.2d 1219, 1225 (D.C.2001) ("[W]hile agencies have an obligation to provide services and facilitate family reunification, this court has found no statutory requirement that such agency action is a 'condition precedent' to the commencement of a termination of parental rights proceeding since the 'overriding consideration is the best interests of the child.'") (citing *In re A.C.*, 597 A.2d 920, 924–26 (D.C.1991)); *see also In re J.M.C.*, 741 A.2d 418, 426–27 (D.C.1999).

■ L.P.'s complaint that the trial judge failed to give proper consideration to her interest in maintaining her parental rights and in having her sister function as interim caretaker is equally unavailing. As we said in *In re K.I.*, 735 A.2d 448 (D.C.1999):

> Although biological parents have a "fundamental liberty interest ... in the care, custody, and management of their child [which] does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State[,]" ... that interest is not absolute since "[t]he paramount concern is the child's welfare and all other considerations, including the rights of a parent to a child, must yield to its best interests and well-being."

*Id.* at 454 (citation omitted). Here, the trial court properly exercised its discretion in deciding that it was not in the children's best interests to continue to wait while their mother sought to prepare herself for eventual care of the children; nor was it in their best interests to hold out the hope that L.P.'s sister, D.P. would be able to care for them, without the cooperation of L.P.

■ A.R., Antj.P.'s father, who was incarcerated at the time he attended the TPR hearing, contends that agency workers failed to diligently search for him to notify him of the neglect proceedings and were "grossly indifferent to [his] rights as a parent." Alternatively, he claims that "the record is ... devoid of any persuasive evidence that the [t]rial [c]ourt considered the factors set forth in D.C.Code § 16–2353 as they apply to [him]."

The pivotal question here is not whether A.R. received notice of the neglect proceeding, as he argues, but whether he was duly notified of the TPR proceeding. The trial court determined that he received proper notice; and he had an opportunity to be heard at the TPR hearing. Therefore, he was not denied due process. *See In re E.S.N.*, 446 A.2d 16, 18–19 (D.C. 1982).

■ A.R.'s alternative argument is equally unpersuasive. The trial court's finding that A.R. was "well aware of [Antj.P.'s] birth" is substantiated by the record on appeal. While A.R. did not testify during the termination hearing, even though he was present, his mother, K.R., was called as a witness on his behalf. She stated: "I'm [Antj.P.'s] grandmother ...." She knew that Antj.P. had been born in 1996, and was A.R.'s son. The record contains no evidence that either A.R. or K.R. visited Antj.P. or contributed to his support. Given the absence of such evidence, the trial court declared that A.R. "ha[d] an opportunity ... to develop a relationship with [Antj.P.] [but failed to] grasp[] that opportunity and accept[] some measure of responsibility for [his] future."

■ The question posed on this record is whether the trial court could make rea-

sonable inferences about A.R.'s presence and silence at the TPR hearing. In response to this court's request that the District government address this question, the District filed a post-argument memorandum calling the court's attention to *Murphy v. McCloud,* 650 A.2d 202 (D.C. 1994), where a person claiming to be "the natural daughter" of the decedent did not testify at a trial on the issue, and the trial judge declined to draw a negative inference about paternity from her failure to testify. We reversed, stating in part that "the trial judge's conclusory rejection of any inference adverse to [the person claiming to be decedent's daughter] was based on a misapprehension of applicable legal principles...." In surveying the law in this area, we said: "[w]hen a party to a case refuses to take the stand and testify to the facts peculiarly within [his] knowledge, *this Court* [*i.e.,* the appellate court] is warranted in drawing an inference that the testimony would be unfavorable." *Id.* at 216 (quoting *Chalkley v. Chalkley,* 236 Md. 329, 203 A.2d 877, 879 (1964)).

Furthermore, in care and custody proceedings involving children in Massachusetts, the Supreme Judicial Court of Massachusetts permits negative inferences to be drawn from the failure of a parent to testify. *See In re Care and Protection Summons,* 437 Mass. 224, 770 N.E.2d 456, 466 (2002); *Custody of Two Minors,* 396 Mass. 610, 487 N.E.2d 1358, 1363 (1986). Such inferences are permissible because "the rights of children to a stable and safe environment assume an importance at least equal to the interest of the parents in a fair proceeding." *Custody of Two Minors, supra,* 487 N.E.2d at 1364 (citations omitted).

In sum, A.R. had peculiar knowledge concerning the nature of his relationship with his son, Antj.P. His testimony would have aided the trial court in assessing the D.C.Code § 16–2353 factors as they pertained to him. Since he sat mute at the TPR hearing, we cannot say that the trial court improperly drew an adverse inference as to his relationship with his son, where the controlling legal principle is "the best interests of the child."

On the record as a whole, we are satisfied that the trial court did not abuse its discretion in determining that termination of parental rights is in the best interests of the children. *See In re T.W.P.; In re J.M.C., supra.* Therefore, we affirm the judgment of the trial court.